# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT NASHVILLE

### SEPTEMBER 1999 SESSION

FILED

October 5, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | |
| | ) | **C.C.A. NO. 01C01-9809-CC-00371** |
| Appellee, | ) | |
| | ) | **WILLIAMSON COUNTY** |
| VS. | ) | |
| | ) | **HON. DONALD P. HARRIS,** |
| **JASON BURNS,** | ) | **JUDGE** |
| | ) | |
| Appellant. | ) | (Aggravated Child Abuse and Neglect) |

FOR THE APPELLANT:       FOR THE APPELLEE:

**ROBERT H. PLUMMER, JR.**     **PAUL G. SUMMERS**
415 Bridge St.     Attorney General & Reporter
P.O. Box 1361
Franklin, TN 37065-1361     **ELIZABETH B. MARNEY**
Asst. Attorney General
John Sevier Bldg.
425 Fifth Ave., North
Nashville, TN 37243-0493

**RON DAVIS**
District Attorney General

**DEREK SMITH**
Asst. District Attorney General
P.O. Box 937
Franklin, TN 37065

OPINION FILED:_____

**AFFIRMED**

**JOHN H. PEAY,**
Judge

# **O P I N I O N**

A jury found the defendant guilty of aggravated child abuse and neglect, and he received an eighteen year sentence in the Tennessee Department of Correction. He now appeals, raising the following issues:

I. Whether the convicting evidence is sufficient;

II. Whether the trial court erred in admitting testimony from a Department of Child Services investigator that the victim cried at the mention of the defendant's name;

III. Whether the trial court erred in failing to suppress his statements to the police on the basis his mental incompetence prevented a knowing and voluntary waiver of his Miranda rights; and

IV. Whether the trial court erred in not allowing educators to testify about the defendant's mental abilities unless the defendant first testified.

Finding no merit to the defendant's arguments, we affirm his conviction.

At trial, Detective Terrance Smithson of the Franklin Police Department testified that on March 25, 1997, he was summoned to the Williamson County Medical Center to investigate the circumstances surrounding severe burns sustained by the three-year-old victim in this case. Detective Smithson testified that when he arrived, the victim was in the process of being transferred to the Vanderbilt University Medical Center. Three individuals had accompanied the victim to the hospital---his aunt, Sarah McWilliams; Ms. McWilliams' live-in boyfriend, the defendant; and the defendant's guardian, Tommy Perkins---but according to Detective Smithson, none of them seemed concerned about the victim or admitted knowing what had happened to him.

Detective Smithson testified he first observed the victim's injuries at Vanderbilt. According to the detective, the victim had sustained severe blistering and

2

"skin slippage"[1] to his lower legs and feet and his genital area. Pictures of the victim's genital area reflect his penis was grossly enlarged from thermal injury. Detective Smithson also testified that the victim had a bruise on his thigh and to his left eye, but the victim did not have any injuries on the soles of his feet or his buttocks. When Detective Smithson attempted to talk with the victim, the victim was unresponsive. Before Detective Smithson left the hospital, he told Mr. Perkins to bring all of the house residents to the police department the next day for questioning.

Detective Smithson testified that when he interviewed the defendant the next day, he told him he was investigating a serious offense and someone would have to answer for it. The detective testified he read the defendant his Miranda rights and the defendant waived them, but he did not arrest the defendant. He also testified the defendant was unresponsive unless asked a direct question. According to Detective Smithson, the defendant denied knowing what had happened, but said he woke at 6:00 a.m. on March 25, 1997, to the victim crying and had told the victim to go to the bathroom. According to Detective Smithson, the defendant said when he realized the victim had not returned approximately one hour later, he checked on the defendant and noticed the victim's feet were burnt. The defendant did not admit involvement in the victim's injuries.

Detective Smithson testified he next interviewed the defendant on March 31, 1997, after the defendant again waived his Miranda rights. At the conclusion of that interview, the defendant signed a statement that was introduced into evidence. According to the statement, the defendant admitted he had drawn a bath for the victim on March 24 because the victim had defecated on himself. When the tub was a little less

---

[1]Detective Smithson defined "skin slippage" as skin that had pulled away from the lower layers of the skin.

3

than half full, the defendant turned off the water, told the victim to get into the tub, and left the house to visit his cousin. According to the statement, the defendant said that Ms. McWilliams did not burn the victim because he did, but it was an accident. When Detective Smithson asked the defendant how he had burned the victim, the defendant replied he did not know. Detective Smithson testified that when he stated he had three children and could understand how the defendant could become angry if the victim had defecated on himself, the defendant replied, "I know what you're trying to do. You all think you're slick."

Detective Smithson testified that he also interviewed the defendant approximately one week later when the defendant appeared at the police station and claimed he remembered something. The defendant's statement, which was introduced into evidence, recounted a previous incident in which Ms. McWilliams apparently placed the victim in a tub of hot water, prompting the victim to cry. When the defendant asked Ms. McWilliams why she was doing that, she told the defendant to mind his own business. Detective Smithson asked the defendant why he did not tell him this earlier, and the defendant replied he did not know.

Detective Smithson also testified he tested the temperature of the hot water in the bathroom at the victim's residence. He testified his thermometer read 120 degrees and he had no reason to believe that reading was inaccurate, even though the temperature gauge of the water heater, which was in the bathroom, reflected 140 degrees.

Sarah McWilliams, the victim's maternal aunt and the defendant's girlfriend, testified she and the defendant shared a bedroom with the victim and the victim's mother

4

in a house occupied by several individuals. She explained that she and the defendant shared one bed while the victim and his mother shared a different bed. According to her testimony, on March 24, 1997, around 3:00 p.m., the victim defecated on the toilet and on himself and could not clean it up. Ms. McWilliams testified the defendant offered to give the victim a bath and then remarked that he should give the victim a bath in hot water. Ms. McWilliams testified that when she asked him what he meant by that statement, the defendant looked like he was going to harm her.

According to Ms. McWilliams, the defendant ran some water in the bathtub. A few moments later, she checked the temperature of the bath water because she was curious from the defendant's previous statement, but the water was not hot. The defendant continued to run water into the tub. Ms. McWilliams testified that she sent the victim into the bathroom and a few moments later, she heard the victim crying. When she checked on the victim, he was standing in the tub and the defendant was still in the bathroom. Ms. McWilliams asked the victim why he was crying. She testified that the victim stopped, so she left the bathroom. She testified she then heard the defendant add more water to the bathtub and the victim began to cry again. Again, she went to the bathroom and found the victim standing in the bathtub. She testified that she asked the victim why he was crying, but again he did not answer. Instead, the defendant hit the victim in the eye. Ms. McWilliams testified she became frightened she would be blamed for any injuries to the victim, so she left the house and went to talk with a friend while the defendant continued to bathe the victim. When she returned to the house, the bathroom was empty, the defendant had left the house, and the victim was in the bedroom. According to Ms. McWilliams, the victim was sitting with his lower legs folded underneath of his buttocks and was holding up his hand crying, "Jason [the defendant] hit me." Ms. McWilliams testified that when she asked the victim what had happened, he only replied

5

that the defendant had hit him. According to Ms. McWilliams, the defendant's hands and lower legs were "a little reddish," but not bad enough to seek medical treatment.

Ms. McWilliams testified she dried the victim, who indicated the area around his feet was sore. She did not notice anything unusual about his penis. According to Ms. McWilliams, the victim did not want her to wipe his legs or put socks on his feet. Ms. McWilliams dressed the victim in a shirt, underwear, jogging pants, and socks, and the two watched television for approximately five hours. According to the witness, the victim was acting strangely because he did not want to eat dinner or watch television, but rather just wanted to go to sleep. Ms. McWilliams testified she put the victim to bed between 9:00 p.m. and 10:00 p.m. According to her, when she removed the victim's jogging pants, the victim showed no pain, although his legs reflected the same degree of mild redness she had previously observed. She testified that the defendant had returned home at approximately 8:00 p.m., but did not have contact with the victim that evening.

Ms. McWilliams testified that the next morning around 7:00 a.m., the defendant called the victim, who was still dressed in socks and underwear, to their bed and asked what was on the victim's feet. Ms. McWilliams surmised that the defendant perhaps believed the victim had again defecated on himself. Ms. McWilliams testified she removed the victim's socks and underwear, saw the blisters on his body, and insisted that the defendant accompany her and the victim to the hospital. According to Ms. McWilliams, the defendant said the victim must have received the injuries in the middle of the night when he either burned himself with hot water or when a rat bit him. According to Ms. McWilliams, the victim was removed from the household following this incident and placed in the custody of his paternal aunt.

6

Ms. McWilliams testified that within one week after the burning, she had moved out of the house where the defendant was living. According to her testimony, the defendant came to her new residence and talked with her on the front porch, telling her that he had hurt the victim "because of his mother" and that if he went to court, he would "run" or kill himself. She testified that the defendant and the victim's mother did not get along because the victim's mother would often leave the residence for the evening, leaving the victim in the care of Ms. McWilliams and the defendant. She also testified that the defendant had complained that the victim was not potty-trained and would defecate on himself and items in the house. According to Ms. McWilliams, the defendant had also said the victim "acted gay" and "walked gay."

On cross-examination, Ms. McWilliams admitted that when the victim's mother left the house, the only person affected was her, not the defendant. She also testified that when she found the victim sitting on his lower legs after his bath, he complained only about his hand, which did not sustain any burning injuries.

Deborah Walton, the defendant's cousin, also testified. She admitted knowing both the defendant and Ms. McWilliams, but claimed she did not favor one over the other. She testified she overheard part of a conversation between the defendant and Ms. McWilliams on the front porch of Ms. McWilliams' new residence approximately one week after the burning incident. According to Ms. Walton, the defendant said if he had harmed the victim, it was an accident. She also testified that she overheard the defendant say that when he ran water for the victim's bath, he did not know whether the water was hot or cold because he did not check its temperature.

Lea Hicks, an investigator with the Department of Children's Services,

testified she visited the victim in the hospital shortly after the incident, but he was incapable of making any statements. She attempted to talk with the victim the next day, but he still did not communicate with her. She testified she made a final attempt to talk with the victim on April 3, 1997, but still received no response from the victim. She testified she began naming the various individuals in the household, with the defendant's name being the last name mentioned. According to Ms. Hicks, the victim remained stoic as she said every name, until the defendant's name was mentioned. Over defense objection, Ms. Hicks testified that the victim began screaming and crying when the defendant's name was mentioned. She testified she made a note of the victim's reaction because she thought it unusual the victim reacted so dramatically.

On cross-examination, Ms. Hicks admitted she could not surmise whether the victim's reaction meant the defendant had burned the victim or whether there was some other reason the victim did not like the defendant or some other event that had happened. Ms. Hicks also admitted that her interview session with the victim had lasted approximately thirty to forty minutes and she did not know whether it was possible the victim began crying simply because he wanted the interview to end.

Dr. Gerald Hickson, a pediatrician at the Vanderbilt University Medical Center, testified he had examined the victim and found first-, second-, and third-degree burns to the victim's penis and genital area, the inside of his thighs, and his lower legs. Approximately twelve percent of the victim's body was burned. According to Dr. Hickson, thermal injuries such as these, which were caused by a hot liquid, produced blistering almost immediately, within a matter of minutes. He testified that the length of time of sustained contact necessary to produce such severe burns depended upon the temperature of the water. In other words, he explained, if the temperature of the water

8

was 120 degrees or less, forty-five to sixty seconds of sustained contact would be necessary to produce second-degree burns, whereas if the water temperature was 140 degrees, only fifteen to thirty seconds of exposure would be necessary to produce second-degree burns.

Dr. Hickson testified that the injuries in this case could have been caused by water being continuously splashed upon the victim while the victim was standing because there was a lack of injuries to the victim's buttocks, outer thighs, upper legs, and soles of his feet. The lack of injuries in those places, Dr. Hickson testified, excluded the possibilities that the child slipped and fell into the water or that the child immersed himself in a full tub of water. Dr. Hickson testified that the pattern of the injuries to the victim's groin and inner thigh area was consistent with water being splashed on that area. Dr. Hickson also testified that the pattern of the burns on the feet was consistent with immersion in water, although the fact that the soles were not burned indicated that the victim was standing at the time and his soles were insulated by the tub.

On cross-examination, Dr. Hickson reiterated that blisters from burns similar to those sustained by the victim manifest themselves almost immediately. He also testified that given the size and prominence of the blisters in this case, the blisters should have been noticed by someone putting socks and underwear on the victim shortly after the incident.

The State attempted to call the victim, who was four years old at the time, to the witness stand. The trial court judge ruled, however, that based on an interview with the victim, the victim was incompetent to testify. The State rested its case, and without presenting any proof, so did the defendant. Based on this evidence, the jury found the

defendant guilty of aggravated child abuse and neglect.

The defendant argues that the evidence is insufficient to support his conviction because Dr. Hickson testified the victim would have blistered immediately while Ms. McWilliams testified she did not see the blisters until the next day, during which time the defendant did not have contact with the victim. When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in the light most favorable to the prosecution in determining whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). We do not reweigh or re-evaluate the evidence and are required to afford the State the strongest legitimate view of the proof contained in the record as well as all reasonable and legitimate inferences that may be drawn from the proof. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). A guilty verdict rendered by the jury and approved by the trial judge accredits the testimony of the witnesses for the State, and a presumption of guilt replaces the presumption of innocence. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).

Here, notwithstanding Ms. McWilliams' testimony that she did not observe the blisters until the day after the defendant bathed the victim, the State presented ample evidence for the jury to conclude that the defendant caused serious bodily injury to the victim by knowingly exposing him to hot water. Dr. Hickson testified that the victim's injuries were consistent with being splashed with hot water while the victim was standing. The evidence showed that the water temperature at the residence was between 120 and 140 degrees, and in order to cause second- and third-degree burns with that temperature of water, the victim must have been exposed to the water for anywhere from fifteen to

10

sixty seconds. The evidence also showed that the defendant, who was irritated with the victim's toilet-training problems, volunteered to bathe the victim, stated he should give the victim a bath in hot water, caused the victim to cry two times during the bath while the victim was standing in the tub, and hit the victim when he cried. Moreover, the defendant admitted he bathed the victim in hot water and caused the victim's burns. Despite the defendant's claim that he caused the burns accidentally, the evidence is sufficient to support the defendant's conviction for aggravated child abuse and neglect. See T.C.A. §§ 39-15-401(a), 39-15-402(a)(1).

The defendant also argues that the trial court erred in failing to suppress his statements to Detective Smithson. The defendant argues that because he has below average intelligence with a second-grade verbal ability, he was unable to intelligently, knowingly, and voluntarily waive his Miranda rights, thus invalidating his waiver.

At the suppression hearing, the defendant introduced testimony from high school educators who had previously worked with the defendant to support his claim that he has below average intelligence and only a second-grade verbal ability. To rebut this testimony, the State presented testimony from a psychiatrist who had conducted a court-ordered mental evaluation on the defendant. She testified that a low intelligence quotient did not necessarily mean an individual would be unable to understand his Miranda rights. The trial court judge asked the psychiatrist whether the defendant would understand his Miranda rights if the Miranda waiver form was read to him, and she replied that the defendant would. In her opinion, the defendant was competent to waive his Miranda rights because he had the ability to understand the information on the waiver form and was able to understand her instructions during her evaluation of him. Based on this evidence---in particular, the psychiatrist's testimony---the trial court found that the

11

defendant understood his <u>Miranda</u> rights as read to him. Because the evidence supports this finding, the defendant's argument must fail. <u>See</u> <u>State v. Tate</u>, 615 S.W.2d 161, 162 (Tenn. Crim. App. 1981)(factual findings of the trial court have the weight of a jury verdict and will not be set aside unless the evidence preponderates against them).

The defendant next argues that the trial court erred in admitting the testimony of Ms. Hicks regarding the victim's negative reaction when she mentioned the defendant's name. According to the defendant, this testimony is nonverbal hearsay and does not tie the defendant to the injury. The defendant also argues that the unfair prejudicial effect far outweighs any probative value of this evidence. The State argues that the testimony was admissible as an excited utterance under Tenn. R. Evid. 803(2).

The State's purpose of offering this testimony was to prove the defendant's identity as the perpetrator of the crime, which renders the evidence hearsay as a nonverbal statement. Tenn. R. Evid. 801(a)(2), (c). The trial court recognized the evidence as hearsay, but admitted it into evidence under the state-of-mind hearsay exception. Tenn. R. Evid. 803(3). The evidence appears to be admissible under Rule 803(3) to show the victim's state of mind when he heard the victim's name, i.e., that the victim was fearful of the defendant or associated some other negative emotion with the defendant, but if admitted for this purpose, the evidence would not then be relevant because the victim's state of mind is not directly probative of whether the defendant burned the victim. <u>See</u> <u>State v. Smith</u>, 868 S.W.2d 561, 573 (Tenn. 1993); Neil P. Cohen, et al., <u>Tennessee Law of Evidence</u> § 803(3).2 (3d ed. 1995).

As the State argues, it appears the excited utterance hearsay exception applies, if the startling event is deemed Ms. Hicks speaking the defendant's name, not

12

burning of the victim. See Tenn. R. Evid. 803(2)(defining an excited utterance as a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition"); State v. Gordon, 952 S.W.2d 817, 821 (Tenn. 1997)(startling event was the pain suffered during urination subsequent to rape, not the rape itself); see also United States v. Napier, 518 F.2d 316 (9th Cir. 1975)(startling event was being shown the defendant's photograph one week after an assault, not the assault itself). Yet even if considered an excited utterance, the evidence was more prejudicial than probative because the State made no showing that the victim's negative reaction stemmed from the burning rather than from some other unrelated event. For all the record shows, the victim could have been upset at the defendant for some other reason or could have been simply expressing his dislike of the defendant for no particular reason.

The State relies upon State v. Gordon in arguing that the evidence was admissible as an excited utterance, but that case is distinguishable from the instant case. In Gordon, a child rape victim screamed in pain during urination. Gordon, 952 S.W.2d at 821. When her mother examined the child, she discovered tears and dried blood in the vaginal area. Id. She asked the child who had hurt her, and the child identified the defendant. Id. In ruling the victim's statement admissible, the Gordon court determined that the startling event was the painful urination and noted that the startling event was related to the underlying sexual offense. Id. In the instant case, there is no showing that the startling event was related to the offense with which the defendant was charged. The ambiguity of the victim's nonverbal statement simply prevented the probative value from outweighing the prejudicial effect. Tenn. R. Evid. 403.

Even so, any resulting error was harmless in light of the defendant's

13

admissions to Detective Smithson and Ms. McWilliams that he burned the victim, albeit accidentally. Accordingly, we will not reverse the defendant's conviction on this ground. Tenn. R. Crim. P. 52(a)(stating, "No judgment of conviction shall be reversed on appeal except for errors which affirmatively appear to have affected the result of the trial on the merits.").

Finally, the defendant argues that the trial court erred in ruling that testimony from educators would be admissible only if the defendant first testified. At the conclusion of the State's evidence, the defendant announced he intended to call to the witness stand two or three educators from his high school to testify that the defendant's mental ability was below average and he could be easily led or manipulated by others. Defense counsel represented he intended to show that Ms. McWilliams or Detective Smithson led him to make his statements to the police in order to explain why he confessed to burning the victim. The State objected on the basis of relevance, maintaining that the defendant must first lay a foundation by putting the defendant on the witness stand to testify that the statements he gave were untrue and that he was manipulated into giving inaccurate statements. The trial court agreed with the State, ruling that the educators' testimony would not be relevant unless the defendant first testified that his statements were inaccurate and/or that he was manipulated into giving those statements. After a brief recess, the defendant announced he would not be testifying, and he offered no other proof. Thus, the educators' testimony was not admitted into evidence.

We recognize the longstanding rule in Tennessee that once a confession is admitted into evidence, a jury may hear evidence concerning the circumstances under which the confession was procured in order to determine whether the defendant made

14

the confession and whether it is true. <u>See</u> <u>State v. Pursley</u>, 550 S.W.2d 949, 950, 952 (Tenn. 1977); <u>Wynn v. State</u>, 181 Tenn. 325, 181 S.W.2d 332, 333 (1944). This rule, however, is inapplicable here because the proffered testimony did not relate to the circumstances under which the confession was procured. In other words, the educators could not testify that the defendant was manipulated into giving a false confession or inaccurate statement; they could only testify that the defendant, in theory, could be manipulated because of below average verbal intelligence. Had the defendant sought to introduce evidence linking the educators' testimony to the circumstances surrounding the defendant's statement---for instance, testimony from Ms. McWilliams or some other witness, including the defendant himself, that the defendant was convinced by a third party to falsely confess---then the educators' testimony would have been relevant. Because the defendant did not offer any such evidence, however, the educators' testimony was not relevant, and we find no error in the trial court's refusal to admit it. <u>See</u> Tenn. R. Evid. 401, 402.

In sum, the defendant has not shown reversible error. Accordingly, the trial court's judgment is affirmed.

_____
JOHN H. PEAY, Judge

CONCUR:


_____
DAVID H. WELLES, Judge


_____
JOHN EVERETT WILLIAMS, Judge

15