IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

**STATE OF TENNESSEE v. ODUS EUGENE LONG**

**Direct Appeal from the Criminal Court for Jackson County**
**No. 96-124   J. O. Bond, Judge**

---

**No. M1998130-CCA-R3-CD - Decided May 25, 2000**

---

Defendant was convicted of first degree murder by a Jackson County Jury, and sentenced to life imprisonment.  Defendant now appeals as of right, and raises three issues, arguing (1) the evidence is insufficient to sustain his conviction because the State did not prove premeditation; (2) the trial court committed reversible error when it allowed a hearsay statement by the deceased into evidence; and (3) the trial court committed reversible error when it did not allow an audiotape to be played for the jury during deliberations, despite the fact that the tape had been previously played and introduced into evidence as an exhibit.  While the evidence is insufficient to sustain a first degree murder conviction, it does support a conviction for second degree murder.  However, because we also hold that the trial court erred in issues (2) and (3), we reverse Defendant's conviction and remand for a new trial.

**Tenn.R.App.P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed and Remanded for new trial**

WOODALL, J., delivered the opinion of the court, in which SMITH, J. and LAFFERTY, S.J. joined.

Lionel Barrett, Nashville, Tennessee, on appeal; Edwin Sadler, Tennessee, at trial, for the appellant, Odus Eugene Long.

Paul G. Summers, Attorney General, Todd R. Kelley, Assistant Attorney General, Tom P. Thompson, District Attorney General, John Wootten, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Defendant Odus "Blue" Eugene Long appeals from his conviction of first degree murder following a jury trial. We hold that there is insufficient evidence of premeditation to support Defendant's conviction of first degree murder; however, there is sufficient evidence to support a conviction for second degree murder.  Nevertheless, we also hold that the trial court committed two errors at trial, both of which are reversible error.  Accordingly, we reverse Defendant's conviction and remand for a new trial on the charge of second degree murder.

# I. Facts

The evidence presented at trial established that Lillian Burgess reported her daughter, Ramona Long, age 38, missing on July 31, 1996. The report, filed in Putnam County, described Ramona as an alcoholic and indicated that she had tried to commit suicide. At the time this report was filed Ramona was legally married to Defendant's son, Ricky Long, but she was separated from Ricky, and lived with Defendant in Jackson County as man and wife. Ramona was known to have an alcohol problem and a tumultuous relationship with Defendant, and thus it was not uncommon for her to leave the Defendant and return to living with him some time later. During these times she dated other men. It was also well known that Defendant frequently physically abused Ramona and held her against her will.

It appears that common knowledge of the type of relationship between Defendant and Ramona caused law enforcement officers to delay their investigation of the report, and it was not until August 5, 1996, that law enforcement officers initially visited Defendant's residence in Jackson County. On August 6, 1996, officers of the Putnam County and Jackson County sheriff's departments again went to Defendant's residence. The officers arrived around 12:30 PM, and although the officers knocked on the door and looked around the property, they did not find anyone. A neighbor stated that Defendant was probably home because all of Defendant's cars were parked at the residence. The deputies continued to look around, and they noticed what they perceived to be possible blood stains on the frame of the front door. They found what they thought was a piece of bloody carpet across from the house on the other side of the road abutting Defendant's property, as well as a hoe handle in the garage that appeared to have blood spatters on it. The officers also found a sunken area of ground behind the garage that looked as if something had been buried there. Based on their observations the officers decided to get a search warrant for Defendant's property for the person of Ramona Long. Deputy J.B. Hix of the Jackson County Sheriff's Department left to get a warrant and the remainder of the deputies stayed at Defendant's property.

Deputy Hix returned approximately one to one and one-half hours later with a warrant, and several officers entered the house. Defendant was waiting in a first floor bedroom with a rifle, and told Deputy Hix to leave the house in explicit language. All the officers promptly exited the residence, and Defendant came to the front door in an attempt to re-lock the door. At this point Putnam County Deputy Doug Burgess started talking to Defendant because Burgess was a cousin of Ramona Long, and knew Defendant personally. Defendant asked Burgess to come up to the front door and talk with him, and Burgess did so.

Burgess talked with Defendant for the next three to four hours. During this time Burgess explained what the deputies were doing, why they had a search warrant, and tried to get information from Defendant regarding Ramona Long's whereabouts. Also during this time Defendant continued to be in possession of a rifle. Defendant initially stated that Ramona was not at the house, and had left with someone in an old pick-up truck. At some point Defendant asked Burgess what the situation would be if Defendant had killed Ramona. Burgess indicated that a proper burial would be appropriate, and as they continued talking Defendant threw a set of keys out of the house.

Burgess inquired what the keys were for, and Defendant replied that they were for the bulldozer parked on Defendant's property, and that Ramona Long was buried in front of the bulldozer. Defendant stated that he and the deceased had a fight, and that she committed suicide by shooting herself in the head with a pistol. Defendant then threw the pistol out the door. Burgess continued to negotiate with Defendant because Burgess did not know how to operate the bulldozer, and Defendant agreed to come out of the house to operate the machine to unearth the deceased. As a condition to this agreement Burgess had to move all the law enforcement officers present to the edge of Defendant's property, and Defendant would be allowed to return to the house when he had finished operating the bulldozer.

Defendant, still armed with a rifle, came out of the house, used the bulldozer to uncover the deceased, and returned to the house without incident. Burgess continued to talk to Defendant, who was threatening suicide. Defendant agreed to surrender if he would be allowed to walk over to the deceased's body and see her one last time. Once again, the officers on the scene backed to the edge of Defendant's property, and Defendant, armed with the rifle, came out of the house and went to the grave. After a moment Defendant put the rifle down and surrendered, and he was taken into custody.

After Defendant was taken into custody he waived his rights and spoke with Deputy Hix and Agent Roy Copeland of the Tennessee Bureau of Investigation (TBI). Both officers testified at trial regarding their respective interviews with Defendant. According to their testimony, Defendant told them that on July 26, 1996, Defendant and Ramona had a fight while Ramona was on the phone with her mother, and Ramona then left the house escorted by sheriff's deputies, who had been called by her mother. The next time Defendant saw Ramona was on July 31, 1996, at a bar called the Green Fly. She came back home with Defendant, and they had a fight. Ramona tried to cut Defendant with a knife, but he knocked her knife-hand away, and the knife inflicted a flesh wound on Ramona's neck. On Thursday, August 1, she slept in until midday, and took 12 to 15 Valium that night. Early in the morning hours of August 2, she asked for a wet rag (for her neck wound) and a Coke. Defendant got the cloth, then left the bedroom to get the drink, and while in the kitchen he heard a gunshot. Defendant stated that Ramona shot herself in the bedroom with the gun that Defendant kept in a drawer next to the bed. Afterwards Defendant washed Ramona off, and laid her in the closet wrapped in a blanket. He cleaned the bedroom to remove bloodstains, and cut-out the parts of the mattress that were stained with blood. Defendant buried Ramona in the morning on Saturday, August 3, and then cut out the carpet in the closet because it was soaked in blood. Defendant told Agent Copeland that he did not call the authorities about Ramona's death because he was scared and afraid and also planned to commit suicide. Defendant stated that he was also scared that the authorities would accuse him of killing Ramona.

The search of Defendant's property on August 6, 1996, uncovered several items with what appeared to be human bloodstains, including a washcloth, the piece of carpet that deputies noticed across the road, mattress material (contained in a bucket), a piece of mattress, and pieces of burned and torn currency that were found in a wood stove. Swabs were taken from the apparent bloodstains on the doorframe. A handwritten note on yellow paper was also recovered by Deputy Hix, but the note disappeared before trial. At trial Shelly Betts, a TBI forensic scientist, testified that she

-3-

confirmed the presence of bloodstains on the mattress material, piece of mattress, money, washcloth, and carpet. She was not able to match those stains to any particular individual because no "standard," or blood sample from a person, was submitted for purposes of comparison.

At trial the State sought to prove that Defendant committed premeditated murder. Although the defense did not present any evidence, the defense opening and cross examination of prosecution witnesses tried to show that Ramona Long committed suicide. One piece of evidence pertinent to both theories was a tape cassette found in Defendant's garage during the initial search of Defendant's property. Agent Copeland was made aware of this tape by James Smith, a reserve Putnam County Sheriff's deputy whose sister lived with Defendant's son. Smith informed Copeland that his sister had promised Defendant that she would get two cassette tapes from Defendant's garage. Copeland asked Defendant about the tapes, and Defendant acknowledged their existence and volunteered their location in the garage–which was consistent with the information provided by Smith. Copeland then recovered the tapes.

One of these tapes was introduced at trial as an exhibit and played for the jury. The tape contains an extended soliloquy by Defendant, in which Defendant talks about Ramona in the present tense, reveals how he and Ramona planned their respective suicides, divides up his property among his children, and discusses funeral arrangements. However, Defendant also refers to a fight in which Ramona had a knife, and how in the fight Ramona was accidentally cut with the knife on the throat. On the tape Defendant explains that this injury made talking very difficult for her, and that was why she did not record her wishes on the tape along with Defendant. Defendant also refers to Ramona in the past tense in at least three places. The components of Defendant's speech were not recorded without interruption–the sound of the recording device clicking on and off again is audible several times throughout the tape.

The State attempted to discredit the theory of suicide through testimony and evidence that contradicted such a theory. For example, the State tried to show that Defendant had motive to kill Ramona. Agent Copeland testified that he and Deputy Hix searched Defendant's property two additional times while Defendant was incarcerated pending trial. Each time Defendant consented to the search and assisted the officers in the search. The first search was for the spent shell casing and the bullet that killed Ramona, and was not successful. During the search Defendant discussed the events during the days preceding the murder with the officers. Copeland testified that at one point one of the deputies commented that Ramona did not deserve what happened to her, and Defendant replied "well by God she shouldn't have done what she done" in an "angry type voice." When Copeland asked Defendant to elaborate, Defendant paused and stuttered "like a ha, or something of that affect (sic). And then he said–I asked him again at that point what she had done, and he said, well she laid down in there and shot herself." Defendant also discussed with the officers Ramona's infidelities, and Copeland asked if Ramona's activities with other men caused Defendant to be angry with her. Copeland testified that Defendant "asked me if it was my wife, he said, quote, wouldn't you have got mad?"

The State also tried to show motive through the testimony of David Fox, who was employed as a Jackson County Sheriff's Deputy in the summer of 1996. Fox testified that he responded to a domestic violence call at Defendant's residence on July 26, 1996. At that time Ramona indicated that she wished to go to her mother's house in Putnam County, and Fox offered to drive her to the Putnam County line. When Fox left with Ramona, Ramona directed him to turn in a different direction than the county line in order to show Fox where Defendant was growing some marijuana:

Q: Now, did [Ramona] ask you about what not to do with that information?
A: Yes, sir.
Q: And what was that?
A: She said if I told [Defendant]–if he found out she had told me that he would kill her.

In addition to showing motive the State tried to highlight inconsistencies in Defendant's suicide theory. During the first search of Defendant's property after Defendant's incarceration Copeland also asked Defendant about the presence of bruises on Ramona's body. Defendant explained that he had not put the bruises on her, and that she had the bruises when she reunited with Defendant on Wednesday, July 31, 1996. However, Copeland also testified that Defendant conceded that he had "beat the hell out of her before." The State contradicted Defendant's explanation by presenting testimony of Ramona's friend, Vicki Holliman, who was with Ramona on the night of July 31st. Holliman testified that prior to going to the Green Fly, while Ramona was dressing to go out, she saw Ramona nude from the waist up, and that there were no bruises on her body–the only marks were carpet burns on Ramona's knees. The State also presented the testimony of Charles Harlan, M.D., who autopsied Ramona Long's body. Dr. Harlan testified that at the time of the autopsy there were two bruises above Ramona's left clavicle, one on the upper left arm, and one on the left thigh. Dr. Harlan testified on cross examination that the bruises would have occurred prior to death or within 15 to 20 minutes after death.

As to physical evidence of suicide, James Russell Davis II, a TBI forensic scientist, testified that he tested samples of matter taken from the skin of Ramona's right hand, and that these samples tested negative for gunshot residue. He conceded on cross examination that it was possible that the decomposition of a body could lead to the dissipation of gunshot residue from the skin. Dr. Harlan testified that the gunshot wound that killed Ramona was a "tight contact" wound on the right side of Ramona's head. Dr. Harlan testified that this type of wound is created when the muzzle of a weapon is placed tightly against the skin and fired. Dr. Harlan acknowledged on cross examination that tight contact gunshot wounds are "frequently seen in individuals who commit suicide. That type of wound is not exclusively seen with suicide however."

The State also presented several witnesses who testified to Defendant's demeanor in the few days after Ramona's death and before Defendant's arrest. Vicki Holliman testified that she went to Defendant's residence on August 5, 1996, with Ramona's mother, Lillian Burgess, to pick-up the outfit that Ramona wore on July 31, because the outfit belonged to Holliman. Defendant told Holliman that Ramona had left with another person, and that Ramona took the outfit with her when she left.

Lewis Paul Lawson testified that he went over to Defendant's house to play pool on Sunday, August 4, 1996, along with Defendant, Defendant's son, and some other men. They played pool in Defendant's garage, and Lawson testified that a bad smell was present. Lawson asked Defendant about the smell, and Defendant said he thought that his dogs might have brought a dead animal near the residence. Lawson testified that Defendant acted normal.

Roy Thomas testified that he hired Defendant to do some "bushhogging"–or work clearing land–with Defendant's bulldozer some time on the weekend of August 3 and 4, 1996. Defendant came over to Thomas' house early one morning, and performed the work. Thomas testified that Defendant acted normal.

Suzanne Long, Defendant's granddaughter, testified that she was employed with Ramona at Osh Kosh B-Gosh. She stated that on Monday, August 5, 1996, at the behest of Defendant, she attempted to collect Ramona's paycheck for the month of July. Defendant told her that Ramona would like Suzanne to collect the check. Tommie Donohue, human resources manager at Osh Kosh B-Gosh testified that as per company policy she refused to give the check to Suzanne because Suzanne did not have written authorization from Ramona. Defendant called Osh Kosh after Suzanne attempted to collect Ramona's paycheck, and Defendant asked if Suzanne had indeed received the check. Donahue explained why the company could not give the check to Suzanne.

Finally Jackson County Deputy Sheriff Kenneth Bean testified that he visited Defendant's house on the evening of August 5, 1996, to look for Ramona. Defendant told Bean that Ramona left with someone in a pick-up truck on August 2, 1996, and was not at the house. Defendant stated that he tried to pick-up Ramona's paycheck because she called him on August 4, and asked him to pick it up because her back was hurting. Defendant then allowed deputies to search the house for Ramona. Bean testified that when the deputies were in the bedroom Defendant walked over to the closet without being prompted or instructed, ran his hands across the clothes in the closet, "and said, look she's not in here, and kind of smiled at us, and we went on looking through the rest of the house."

## II. Analysis

Defendant presents three issues in this appeal. First, Defendant argues that the evidence is insufficient to sustain his conviction because the State did not prove premeditation. Second, Defendant argues that the trial judge committed reversible error when it allowed a hearsay statement by the deceased into evidence. Finally, Defendant argues that the trial judge committed reversible error when it did not allow the audiotape of Defendant's making to be played for the jury during deliberations, despite the fact that the tape had been previously played and introduced into evidence as an exhibit. We hold that there is insufficient evidence of premeditation to support Defendant's conviction of first degree murder. We also hold that the trial court erred when it admitted the hearsay statement into evidence, and it was error not to allow the jury to listen to the tape.

### A. Sufficiency of the evidence

Defendant contends that there is insufficient evidence to support his conviction of premeditated first degree murder because the State introduced no evidence of premeditation. We agree, but hold that there is sufficient evidence to support a conviction of second degree murder.

When an accused challenges the sufficiency of the convicting evidence, the standard is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Shepherd, 902 S.W.2d 895, 903 (Tenn. 1995) (citing Jackson v. Virginia, 443 U.S. 307, 322-25 (1979)). The sufficiency of the convicting evidence must be examined in light of all the evidence presented to the jury, including that which is improperly admitted. Lockhart v. Nelson, 488 U.S. 33, 41-42 (1988); State v. Longstreet, 619 S.W.2d 97, 100-101 (Tenn. 1981). Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, not this Court. State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). Nor may this Court reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

A jury verdict approved by the trial judge accredits the State's witnesses and resolves all conflicts in favor of the State. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences therefrom. Cabbage, 571 S.W.2d at 835. Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this Court of illustrating why the evidence is insufficient to support the jury verdict returned by the trier of fact. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A crime may be established by circumstantial evidence alone. State v. Tharpe, 726 S.W.2d 896, 899-900 (Tenn. 1987). However, before an accused may be convicted of a criminal offense based only on circumstantial evidence, the facts and circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant." State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971). In other words, a "web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inferences save the guilt of the defendant beyond a reasonable doubt." Id. at 613.

Defendant was convicted of first degree murder in violation of Tennessee Code Annotated § 39-13-202(a)(1). At the time of Defendant's offense this code section defined first degree murder as the "premeditated and intentional killing of another." Id. (1997).

> As used in subdivision (a)(1) "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly

decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d). Intentional is defined elsewhere in the code as referring "to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Id. § 39-11-106(a)(18) (1997).

By comparison, at the time of Defendant's offense second degree murder was defined as a knowing killing of another. Id. § 39-13-210(a)(1). Knowing is defined in the code as referring:

to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result[.]

Id. § 39-11-106(a)(20).

When a homicide is proved at trial it is presumed to be second degree murder, and the State bears the burden of proving the element of premeditation sufficient to raise the offense to first degree murder. State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999); State v. Brown, 836 S.W.2d 530, 543 (Tenn. 1992). The element of premeditation is a question for the jury which may be established by proof of the circumstances surrounding the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Our Supreme Court has observed that there are several factors that tend to support the presence of premeditation, including (1) the use of a deadly weapon upon an unarmed victim, (2) the particular cruelty of the killing, (3) declarations by the defendant of intent to kill, (4) evidence of procurement of a weapon, (5) preparations before the killing for concealment of the crime, and (6) calmness immediately after the killing. Id. (citing Brown, 836 S.W.2d at 541-42; West, 844 S.W.2d at 148).

With these factors in mind we turn to the State's argument that there is sufficient evidence to show premeditation. The State's brief asserts that premeditation may be inferred because (a) the "victim had engaged in sexual relations with other men"; (b) Defendant "admitted that Ramona 'slept around' and that he was 'angry with her' for that"; (c) Defendant "admitted that he had 'beat the hell out of her before' in the past due to her indiscretions"; (d) the "victim had expressed her fear" of Defendant; (e) when "the victim's mother and sister went to the defendant's in search of Ramona that the defendant told them that she had left with another individual" (sic); (f) Defendant told the same story in (e) to Jackson County Sheriff's Deputy Kenneth Bean; (g) Defendant "acted normally when a group of friends came to his house to shoot pool after Ramona's death"; (h) when officers came to Defendant's home on August 6, 1996, Defendant asked Deputy Doug Burgess "What if I killed her?"; (i) Defendant recovered Ramona's body for law enforcement after hiding it; (j) Ramona died from a close range gunshot wound to the right temple; (k) Ramona had a knife

wound on her neck; (l) Defendant admitted that he caused the knife wound; (m) Ramona's hands did not test positive for particles of gunshot primer residue.

We think the above evidence proves that Defendant knowingly killed Ramona Long. It does not prove that he did so in a premeditated fashion. On appeal, the State makes the same erroneous argument made at trial, and argues that premeditation is proved by the voluminous amount of evidence regarding Defendant's actions after the killing, including interactions with other persons, Defendant's inhospitable reception of law enforcement officers at his residence on August 6, 1996, and Defendant's own statements to law enforcement in which Defendant described his efforts to hide evidence of the killing. However, "[t]he concealment of evidence may be associated with the commission of any crime and the accompanying fear of punishment. One who kills another in a passionate rage may dispose of the weapon when reason returns just as readily as the cool, dispassionate killer. The fact that evidence is subsequently hidden from the police reveals nothing about a criminal's state of mind before the crime." West, 844 S.W.2d at 148.

The Bland categories from which premeditation may be inferred are not met by the proof in this case. While there was no evidence the victim was armed, likewise, there was no evidence presented that showed Ramona was unarmed when she was killed. Nor was there any evidence that the killing was particularly cruel. The State presented substantial proof about what Defendant did after the killing, but there was no evidence that Defendant made preparations to kill Ramona, or voiced his intent to kill her to any person. There is no proof of procurement of a weapon by Defendant. It is true that calmness immediately following a killing may constitute evidence of premeditated murder, Bland, 958 S.W.2d at 660, but here we find no evidence in the record regarding Defendant's behavior immediately following the crime. Evidence of Defendant's conduct at more remote points of time after the homicide is not directly probative of Defendant's mind set at the time of the killing. West, 844 S.W.2d at 148.

When the proof at trial is not sufficient to support the greater offense, but is sufficient to support a lesser included offense, this Court has the authority to order a reduction in the degree of the offense for which Defendant could be convicted. State v. Tutton, 875 S.W.2d 295, 297 (Tenn. Crim. App. 1993) (quoting Bandy v. State, 575 S.W.2d 278 (Tenn. 1979)). When the evidence is considered in the light most favorable to the State there is sufficient evidence of a knowing killing.

In conclusion, there is insufficient evidence of premeditation to support Defendant's conviction of premeditated first degree murder. There is sufficient evidence of a knowing killing. However, as discussed in parts IIB and IIC of this opinion, errors committed by the trial court require a reversal and remand for a new trial. As a result, Defendant's new trial must comply with the limitations set forth in the Double Jeopardy Clause of the federal Constitution. U.S. Const. amend. V. Defendant may not be retried for first degree murder. Burks v. United States, 437 U.S. 1, 11 (1978); Greene v. Massay, 437 U.S. 19, 24 (1978); Longstreet, 619 S.W.2d at 100-101. The highest charge that Defendant may be tried upon on remand is second degree murder.

## B. Admission of hearsay

Defendant argues that the trial court erred when it admitted hearsay testimony from David Fox regarding the content of a statement made by Ramona Long prior to her death. The State contends that the statement was not offered for the truth of the matter asserted, and was thus properly admitted as non-hearsay. We hold the statement was hearsay, and improperly admitted. We also hold that this error was not harmless.

As discussed in the facts section of this opinion, the challenged testimony was given by David Fox, a Jackson County Sheriff's Deputy in the summer of 1996. Fox testified that he responded to a domestic violence call at Defendant's residence on July 26, 1996. At that time Ramona indicated that she wished to go to her mother's house in Putnam County, and Fox offered to drive her to the Putnam County line. When Fox left with Ramona, Ramona directed him to turn in a different direction than the county line in order to show Fox where Defendant was growing some marijuana:

> Q: Now, did [Ramona] ask you about what not to do with that information?
> A: Yes, sir.
> Q: And what was that?
> A: She said if I told [Defendant]–if he found out she had told me that he would kill her.

Defendant objected to this line of questioning before it commenced and objected again during the testimony. The trial judge overruled Defendant's objection, apparently holding that the evidence was admissible under Tennessee Rule of Evidence 803(2) as an excited utterance, and in the alternative as a Rule 803(3) statement concerning Ramona's then existing state of mind. Defendant argues that the statement regarding Ramona's fear of Defendant was improperly admitted because it is hearsay, and not within any of the hearsay exceptions. The State concedes that the trial court's rationale for admitting the evidence was incorrect, but argues that the testimony was nonetheless correctly admitted because the testimony is not hearsay. The State points out that Ramona's state of mind was an issue at trial because Defendant raised suicide as a Defense in both Defendant's opening and cross examination of prosecution witnesses. Accordingly, the State reasons that the testimony given by Deputy Fox was not offered to prove that Defendant killed Ramona, but rather to show that Ramona was afraid of Defendant, thus removing the testimony from the hearsay rule.

We first note that the State is correct in asserting that Ramona's state of mind was at issue in the trial. Defendant's opening statement suggested that Ramona committed suicide. Defense counsel vigorously cross examined three of the prosecution witnesses that preceded Deputy Fox, and each time counsel discussed the issue of suicide. Accordingly, evidence regarding Ramona's state of mind at a time near that of the murder was indeed relevant. We also agree that the State did offer Deputy Fox's testimony as evidence of Ramona's state of mind. However, it is abundantly clear that the State offered Fox's testimony primarily to prove that Defendant killed Ramona. In the bench conference immediately preceding the relevant line of questioning, the following exchange occurred:

General: Surely to goodness you can't talk about suicide all the time, and me not be allowed to show a reason to kill her, the reason is two-fold. One about the marijuana, two about the jealousy, the jealousy, and I've got–

Court: I'm more prone to let it in on, but not on the marijuana side of it, but on the statement that's already come in about her leaving him, taking her, dropping her off at the county line, that's the same testimony that come up, the same officer.

General: But also the reason that she said if he finds out I turned him in, he'll kill me.

Defense: That's speculation.

Court: There's a whole lot of speculation. He couldn't argue that to the jury, it wouldn't be proper, I don't think. Unless he can prove somebody told him.

General: Told him–

Court: That she turned him in.

General: She wound up dead. That's a logical reason and inference to draw circumstantially from it. If you're going to cut me off, just allow suicide, I might as well fold up and go home.

Moreover, the prosecution revisited the issue in closing, emphasizing that Ramona's statement was evidence of Defendant's motive to kill Ramona: "And think, Ladies and Gentlemen, what she told David Fox on the night of the 26[th], he'll kill me if he finds out about that marijuana. He'll kill me." The prosecution also raised the issue when rebutting Defendant's closing: "and we also know that she was scared to death, according to James Randolph, when she left that bar. She left with this defendant but she was scared, he described that. He'll kill me. He'll kill me. That's what she told David Fox, he'll kill me." In short, Ramona's statement, as proffered through Fox's testimony, was offered for the truth of the matter asserted, and thus constitutes hearsay.

Because the statement is hearsay, it is only admissible if it falls within one of the exceptions to the hearsay rule set forth in Tennessee Rules of Evidence 803 and 804. A reading of the rules makes clear that the only exceptions which could possibly apply are rules 803(2) and 803(3)–excited utterances and statements regarding then existing mental, emotional, or physical condition. The trial court admitted the testimony because the judge found the statement to be admissible hearsay under either one of these exceptions. As to rule 803(2), the trial judge erred. There is no evidence in the record that would support the contention that Ramona's statement was an excited utterance. As to rule 803(3), the trial judge also erred. It is true that the statement does show the mental state of Ramona at the time the statement was made to Deputy Fox. However, "only the declarant's conduct, not some third party's conduct, is provable by this hearsay exception." Tenn.R.Evid. 803(3), Advisory Comm'n Comments; State v. Leming, 3 S.W.3d 7, 17-18 (Tenn. Crim. App. 1998); State

v. Farmer, 927 S.W.2d 582, 594-96 (Tenn. Crim. App. 1996). If the statement had been admitted solely to prove Ramona's conduct – that she was afraid of being killed and did not commit suicide a few days later – the statement would have been admissible. However, it is clear the statement was entered to prove Defendant's conduct, not Ramona's, and for this reason, it should not have been admitted.

Having concluded that the testimony regarding the statement was admitted in error, we must now decide if this error is harmless. Tenn.R.App.P. 36(b). We hold that it is not. Ramona's statement provides evidence that Defendant had a motive to kill Ramona. Although the State sought to show that Ramona's infidelity also provided a motive to kill, the proof also showed that this promiscuous behavior was part and parcel of the relationship. Given the fact that this case rests entirely on circumstantial evidence, we cannot say with confidence that the admission of Ramona's statement regarding the marijuana under the theory advanced by the State, did not affect the judgment.

The correct remedy for the trial court's error is the reversal of Defendant's conviction and remanding of the case for a new trial. See State v. Bordis, 905 S.W.2d 214 (1995) (remanding for retrial when evidence insufficient to support first degree murder and trial court erred by failing to redact highly prejudicial portions of defendant's statement). When reversal and remand is based on an error at trial, rather than evidentiary insufficiency, the Double Jeopardy Clause does not bar Defendant's re-trial. Burks, 437 U.S. at 15; State v. Shrum, 643 S.W.2d 891, 895 (1982). As stated in part IIA, however, Defendant may only be tried for second degree murder or a lesser charge.

### C. Refusal to re-play audiotape for the jury during deliberations

Finally, Defendant argues that the trial court committed reversible error during jury deliberations when the jury asked to listen to the audiotape created by the Defendant (introduced as an exhibit), and the judge did not allow the jury to re-hear the tape. The State concedes the trial court erred, but contends that the error was harmless. We hold that the trial court erred, and that the error was not harmless.

We are of the opinion that the trial court's actions are governed by Rule 30.1 of the Tennessee Rules of Criminal Procedure, which provides that "[u]pon retiring to consider its verdict the jury shall take to the jury room all exhibits and writings which have been received in evidence, except depositions, for their examination during deliberations, unless the court, for good cause, determines that an exhibit should not be taken to the jury room." Tenn.R.Crim.P. 30.1. The Advisory Commission Comments further provide that the rule is mandatory unless the judge determines that an exhibit should not be submitted to the jury, and suggests that appropriate reasons for non-submission are (1) the exhibit would endanger the health and safety of the jurors, (2) the exhibit may be subjected to improper use by the jury, or (3) a party may be unduly prejudiced if the exhibit is submitted. Tenn.R.Crim.P. 30.1, Advisory Comm'n Comments.

Here, the jury asked to rehear the tape during its deliberations. The judge informed the jury that they could not listen to the tape again because the tape was prior testimony, and not an exhibit.

In so holding the trial court apparently equated the tape recording with a deposition. We do not think that a tape recording, submitted as an exhibit, is analogous to testimony given via deposition. A deposition is testimony given under oath, with the assistance of counsel, and when entered into evidence "becomes part of the body of testimony as if it had been presented at trial. If the deposition were taken into the jury room during deliberations, a danger exists that the jury might place too great an emphasis on this one portion of the testimony." State v. James Clayton Young, Jr., No. 01C01-9605-CC-00208, 1998 WL 258466, at * 20, Rutherford County (Tenn. Crim. App., Nashville, May 22, 1998) no Rule 11 application filed. We do not think that the same concerns are present with a tape recording submitted as an exhibit. See id. Moreover, the specific exclusion of depositions by the rule, and the lack of reference to other types of evidence, necessarily requires that all other evidence be treated as within the scope of the rule. As a result, the trial court erred when it did not follow the guidelines set forth in Rule 30.1. Even if the trial court had considered these guidelines, however, we think that there is no good cause to keep the tape from the jury. The concerns voiced by the Advisory Commission are not present here, and we do not perceive any other legitimate reason why the tape should not have been re-played.

Nor do we think that the trial court's error is harmless. See Tenn.R.App.P.36(b). The fact that the jury requested the tape to be played is instructive–the jury would not have so asked unless at least one juror believed that the tape had some significance. The State argues that we may find harmless error by placing ourselves in the role of the jury and guessing what the jury would think of the tape. In the State's view, the tape is prejudicial to Defendant's case, and thus even if the jury had listened to the tape they would not have reached a verdict other than that actually returned.

We do not think that the probative meaning of the tape recording is so readily apparent. The statements set forth on the tape are disorganized, repetitive, muddled and sometimes barely discernable. It is true that Defendant refers to Ramona in the past tense at least three times–suggesting that the tape was made after her death. The State asserts that the tape is obviously a post-homicide attempt by Defendant to manufacture evidence consistent with Defendant's assertion that Ramona committed suicide. While this theory may indeed be supported by the statements on the tape, we do not think that the content of the tape necessarily excludes other theories and constructions.

As previously discussed, the State's case is entirely circumstantial. Given this fact, the fact that the jury wanted to re-hear the tape, and the ambiguous nature of the statements on the tape recording, we cannot say that the judge's failure to re-play the tape for the jury was harmless.

As set forth in part IIB, the correct remedy for the trial court's error is the reversal of Defendant's conviction and remanding of the case for a new trial. As stated in part IIA, however, Defendant may only be tried for second degree murder or a lesser charge.

### III. Conclusion

For the above reasons we REVERSE the judgment of the trial court and REMAND for retrial with all proceedings to be conducted consistent with this opinion.