# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
June 9, 2004 Session

## STATE OF TENNESSEE v. MARVIN GLENN WHITE

**Direct Appeal from the Circuit Court for Marion County**
**No. 5534     Thomas W. Graham, Judge**

---

**No. M2003-02299-CCA-R3-CD - Filed August 27, 2004**

---

A Marion County jury convicted the defendant, Marvin Glenn White, of two counts of premeditated first degree murder for which he received concurrent life sentences. On appeal, the defendant contends: (1) the evidence was insufficient to support the convictions; and (2) the trial court erred in admitting statements which constituted double hearsay. Upon review of the record and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOE G. RILEY, J., delivered the opinion of the court, in which JERRY L. SMITH and ALAN E. GLENN, JJ., joined.

Robert B. French, Jr., Fort Payne, Alabama (on appeal); and William C. Killian, Jasper, Tennessee (at trial and on appeal), for the appellant, Marvin Glenn White.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; James Michael Taylor, District Attorney General; and Sherry D. Gouger, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant was convicted of two counts of premeditated first degree murder for killing his wife, Shirley White, and his sister-in-law, Lorraine Young, on November 6, 2000. Marty Graham, White's son, testified that on Sunday, November 5, White came to his residence located in South Pittsburg, Tennessee, driving her "grayish" Honda Accord. Marty stated White appeared "upset" and briefly spoke to him before leaving for the residence of her other son, Michael Graham.[1] White subsequently returned to Marty's residence and expressed her intentions to stay at the residence of her brother, Bill Price. After White left his residence, Marty never saw her again.

---

[1] When we refer to a person by first name only, it is for purposes of clarity since the person has the same last name of another person involved in the case. We intend no disrespect by such a reference.

Marty testified that on Monday, November 6, while he was at work, Kevin Young, Lorraine's son, came by his residence looking for the victims. The next day, Marty drove by the defendant's residence and observed Lorraine's truck, a red Ford Ranger, parked in the driveway. Later that day, Marty learned of the victims' deaths.

Michael Graham testified that when White came to his residence on November 5, she appeared "upset." Approximately two hours prior to her arrival, Michael observed the defendant drive around his driveway searching for White. Michael arranged for White to spend the night at his residence and instructed her to park her vehicle at Marty's residence rather than in his driveway. Michael later learned White spent the night at Price's residence. Michael recalled White had stayed with Price on prior occasions when she and the defendant were separated.

Michael testified that on November 6 at approximately 7:30 a.m., White called him from Price's residence and expressed her intention to return to the defendant's residence in order to retrieve her clothes. Michael instructed White to take someone with her, and White stated her sister, Lorraine Young, planned to accompany her. Michael stated that later that day between 1:30 p.m. and 2:00 p.m., he drove past the defendant's residence and observed Young's vehicle parked in the driveway. He was unable to determine whether White's vehicle was also parked at the residence. Later that night at approximately 9:00 p.m., Kevin Young, Lorraine's son, called Michael inquiring into Lorraine's whereabouts. Michael said the defendant never called that night asking about White.

Michael testified that on the morning of November 7, he drove by the Conoco gas station where Lorraine Young worked, but he did not observe any evidence that she had reported for work. Michael stated he then drove by the defendant's residence and observed Young's vehicle parked in the same location as he had observed on the previous day. Michael called the defendant who stated that on the previous day, the victims drove to Scottsboro, Alabama, in order to purchase a Christmas tree at K-Mart. The defendant informed Michael that he had driven down the highway searching for the victims. Michael testified that when White called him on the previous day, she did not express an intention to travel to Scottsboro.

Michael testified he learned that a vehicle matching the description of his mother's vehicle had been located at the Handy Man parking lot. Michael called the defendant and asked whether he wanted to go to the parking lot, and the defendant told Michael that he did not know whether he should "since he had already driven to Scottsboro." Michael subsequently went to the parking lot, observed White's vehicle, and learned of the victims' deaths.

Bill Price, the victims' brother, testified that on Sunday, November 5, White spent the night at his residence, and he arranged for her to also stay the following night. White was still sleeping when Price went to work on Monday morning. Upon returning from work, he learned that people were searching for the victims. On Tuesday, November 7, Price spoke to Jim Johnson, Lorraine's boyfriend. Price recalled Johnson was worried and upset, stating Lorraine had told him that she would meet him at her residence for lunch at 11:30 a.m. on Monday and would bring him cigarettes.

Doris Stafford, Price's girlfriend, testified that on the morning of November 6, after White had spent the previous night at Price's residence, White stated she intended to retrieve her clothes from the defendant's residence and return to Price's residence. Stafford stated she instructed White

to take Lorraine Young with her. Stafford further stated White did not mention a plan to shop for a Christmas tree.

Stafford testified that later that night at 11:15 p.m., Kevin Young called her and questioned her regarding Lorraine. Stafford then called the defendant who maintained he had no knowledge of the victims' whereabouts. The defendant informed Stafford that he had spoken to the victims earlier that day and that the victims expressed their intentions of traveling to Scottsboro in order to purchase a Christmas tree.

Kevin Young, Lorraine's son, testified that at approximately 9:00 p.m. on Monday, November 6, he and his girlfriend went to the defendant's residence searching for the victims. Upon arriving, Kevin observed Lorraine's vehicle and the defendant's two vehicles parked at the residence. Kevin knocked on both the front and back doors, but no one answered. Upon peering through a window into the kitchen, Kevin observed Lorraine's keys to her vehicle and her cigarettes on a table.

Kevin testified he went to Conoco and called Jim Johnson, who met him at the defendant's residence. They knocked loudly on the door, but no one answered. Kevin then called the police from a neighbor's telephone and returned to the defendant's residence. While Kevin and Johnson were waiting for an officer to arrive, the defendant came to the door. When a police officer arrived, Kevin informed the officer that he was no longer needed.

Kevin testified the defendant informed them that the victims were at his residence eating cake when he went to the doctor earlier that day. The defendant further stated the victims were planning to travel to Scottsboro in order to purchase a Christmas tree. While at the defendant's residence, Kevin called a police officer, who instructed him to wait twenty-four hours before filing a missing person report. Kevin recalled the defendant initially informed him that White did not own a cellular phone. However, when Kevin questioned him regarding a cellular phone number that Kevin had discovered, the defendant stated White kept her cellular phone turned off.

Kevin stated that at approximately 2:00 a.m. on Tuesday, November 7, while driving to a store to purchase cigarettes, he met a vehicle traveling from Alabama. Upon following the vehicle, Kevin discovered the vehicle belonged to the defendant. The defendant parked the vehicle at the defendant's residence, and Kevin approached him. Kevin testified the defendant appeared "startled." Kevin observed that Lorraine's vehicle was still parked at the residence. The defendant told Kevin that he had been searching for the victims. Kevin testified the defendant was wearing a shirt and shorts and that he had been wearing blue jeans and a different shirt earlier.

Kevin testified he subsequently went to Conoco and learned that Lorraine had not arrived for work. While Kevin and Price were at the gas station, the defendant arrived and stated he had driven to Scottsboro to determine whether the victims were involved in an accident and that he planned to return later that morning. The defendant called Kevin between 10:00 and 11:00 a.m. and stated he was preparing to return to Scottsboro. Kevin informed the defendant that he was planning to file a missing person's report.

Kevin stated that upon arriving at the police station, he observed the defendant filing a report. A caller reported to the police that White's vehicle had been located. The defendant asked

the officer whether the victims were inside the vehicle, but the officer did not respond. A second report indicated the vehicle did not belong to White. Kevin subsequently went to a parking lot where he observed the victims inside White's vehicle.

Billy Stoker, an employee at the Beverage Barn in Bridgeport, Alabama, testified that on November 6 at approximately 9:15 a.m., the defendant entered the store wearing either sweat pants or a running suit. The defendant chose a fifth of Lord Calvert blended whiskey. However, he forgot his wallet and stated his intention to return later that day with the money. Stoker stated the defendant remained inside the store for approximately fifteen minutes and that he was not acting unusual.

Betty McCallie, the owner of the Beverage Barn, testified the defendant returned to pay for his earlier purchase between 6:30 and 7:00 p.m. The defendant purchased an additional bottle of whiskey and remained inside the store for approximately fifteen minutes. McCallie stated the defendant was wearing blue jeans and a pullover shirt. McCallie further stated the defendant did not mention White or that he was searching for her.

Kayla McGowan, the receptionist at Grandview Medical Center, testified the defendant scheduled an appointment for 2:20 p.m. on November 6. The defendant arrived at 2:15 p.m., even though McGowan had instructed him to arrive at 2:00 p.m. When McGowan asked the defendant to complete paperwork, the defendant stated he had forgotten his glasses and that he would return. The defendant returned approximately forty-five minutes later. McGowan stated that when the defendant first arrived at 2:15, he seemed "agitated," and when he returned forty-five minutes later from retrieving his glasses, he seemed "calm and cool."

Tabitha Keef, the office nurse, testified that when she examined the defendant, he was wearing a striped rugby shirt and blue jeans. Keef believed the defendant had been consuming alcohol. Keef and the defendant discussed outpatient surgery which was scheduled to be performed one to two weeks later. Keef recalled that when she informed the defendant that he would be sedated and that someone would need to drive him, the defendant stated he did not know of anyone who could drive him. When Keef suggested the defendant's wife, the defendant stated his wife would be unable to drive him. Pat Barnett, who was employed at the outpatient services registration, testified the defendant entered her office at 4:15 p.m. and left approximately ten minutes later.

Tad Kirk, an employee at Handy Man Home Center located on the Alabama state line, testified that upon leaving work shortly after 3:00 p.m. on November 6, he observed a Honda parked in the area of the parking lot located near the edge of the road. Kirk stated he observed the same vehicle in the parking lot when he returned for work the next morning at 7:00 a.m. Michelle Ferguson, another employee, testified she observed the Honda parked in the lot when she left work between 4:00 and 4:30 p.m. on November 6, when she drove past the parking lot at approximately 6:00 p.m., and when she arrived for work before 6:00 a.m. the next morning.

Chief Ronnie Lancaster of the South Pittsburg Police Department testified that upon arriving at the police station on November 7, he learned the victims were missing. Chief Lancaster began to patrol the area, and he arrived around noon at the Handy Man parking lot where he observed

White's vehicle. Upon peering inside the vehicle, Chief Lancaster observed Young's body in the front seat and White's body in the back seat.

TBI Agent Larry Davis testified one of the victims was lying in a fetal position in the front passenger side of the vehicle. The other victim was lying face down in the back seat with her legs folded under her in such a position that her shins were against the driver's seat and her knees were on the floorboard. Young had a gunshot wound to her chest which traveled through her clothes. White had "close contact" gunshot wounds to the back of her left hand and in the area of her collarbone. Agent Davis stated the victims' bodies did not appear to have been moved since being placed inside the vehicle. South Pittsburg Police Officer Wayne Jordan testified he observed dirt and stains on the seats of the victims' pants, and the victims had gravel on their clothing.

Agent Davis testified he discovered two purses in a child restraint seat located in the back seat of the vehicle. The agent observed blood on the purses. The agent found the keys to the vehicle underneath the hand brake and a cellular phone in the glove compartment. Although neither victim was wearing shoes, they were also discovered in the vehicle.

Agent Davis testified the defendant subsequently consented to a search of his residence. Upon arriving, Agent Davis observed Lorraine Young's vehicle parked to the right of the driveway and the defendant's Blazer parked underneath the carport. Upon approaching the carport, the agent observed oil and grease where another vehicle had been parked and "drag marks" on both sides of the gravel underneath the carport.

Agent Davis testified he walked toward a wooden deck located behind the residence and observed that the deck was wet, even though it was covered. The agent further observed a pair of women's shoes on the deck with a stain on one of the shoes. Agent Davis noted the shoes and the rugs on the deck were also wet. Agent Sandra Evans testified the defendant's deck, kitchen, and hallway appeared to have been cleaned. Agent Davis stated he observed blood splatters on the side of a cabinet located near the entrance of the kitchen from the laundry room. He also observed a red substance on the floor next to the cabinet. Agents discovered a wet rug inside the washing machine and a pair of blue jeans and a red, white, and blue pullover shirt, both of which were still wet, inside the dryer. Agents further discovered an artificial fingernail lying in a bowl inside a kitchen cabinet and another artificial fingernail underneath a tin seat located on the far end of the deck. Agents recovered a .38 caliber weapon and numerous boxes of ammunition for .22 caliber, .38 caliber, .25 caliber, and nine millimeter firearms. Chief Lancaster recovered an empty box from inside the residence which was labeled "NAA 22 long rifle stainless mini."

Agent Davis testified he did not observe any damage to the doors or windows which would have indicated a forced entry into the defendant's residence. Agent Davis stated Grandview Medical Center was 9.2 miles from the defendant's residence, and it took approximately eleven minutes to get there when driving at an average speed. The Handy Man parking lot was six-tenths of a mile from the defendant's residence.

TBI Agent Derrick Jones testified that on November 7, the defendant gave a statement after waiving his rights. The defendant informed the agent that he and White had been married for three years, and they had a "good" relationship. According to the defendant, the victims planned to go

shopping at K-Mart in Scottsboro on Monday, and Lorraine Young arrived at the defendant's residence in a red Ford Ranger. The defendant left the residence around noon as the victims were preparing to leave, took trash to a dumpster, returned ten minutes later, and saw that the victims were gone. The defendant stated he arrived at Grandview Hospital for a doctor's appointment shortly before 2:00 p.m., the time of his appointment. Upon arriving at the hospital, the defendant realized he had forgotten his glasses, retrieved them from his residence, and returned to the hospital. After meeting with the doctor, he returned to his residence at approximately 3:30 p.m.

The defendant informed Agent Jones that upon returning to his residence, he noticed Young had left her keys on a table. The defendant then peered inside Young's vehicle and did not see her purse. The defendant stated he began to worry once night fell, and he drove to Scottsboro to determine whether the victims were involved in an accident or experienced problems with their vehicle. He was unable to locate the victims and returned to his residence. The defendant drove to Young's residence at 8:00 or 9:00 p.m. and spoke to Johnson, who was also worried. The defendant stated he was sleeping when Kevin Young and his girlfriend arrived at his residence. The defendant returned to bed once Kevin and his girlfriend left the residence.

The defendant told Agent Jones that he awoke the next morning at 5:00 a.m. and drove to the Conoco gas station where Lorraine worked. Upon arriving, he met Kevin and Price, both of whom were concerned because Lorraine did not report for work. At approximately 11:00 a.m., the defendant went to the South Pittsburg Police Department where he saw Kevin. While speaking to an officer, a report indicated White's vehicle had possibly been found at the Handy Man parking lot, but a subsequent report indicated the vehicle did not belong to White. The defendant returned to his residence, and at approximately 3:00 p.m., an officer arrived requesting him to come to the police station.

The defendant informed the agent that he owned two .38 caliber pistols, a shotgun, a .32 caliber chrome-plated gun, and a derringer. He denied killing the victims and stated he had not seen the victims since they left for Scottsboro around noon on November 6.

Agent Jones testified that on the following day, while at the Marion County Jail, the defendant expressed a willingness to talk further. The defendant stated that on November 6, he washed dog feces off of his deck. He further stated he was unaware of the presence of blood inside his residence. The defendant maintained that, other than the visitors of whom he previously informed the agent, he was the only person at his residence from the time the victims left until he learned of their deaths.

Agent Jones testified that on November 9, the defendant again indicated he wished to talk further. The defendant stated that on Sunday, November 5, he and White traveled to Scottsboro. However, after arguing regarding the purchase of an artificial Christmas tree, they turned around and returned to their residence. The defendant stated that on that same day, he jokingly threw water into White's face; however, White did not take it as a joke. The defendant continued to maintain that he did not kill the victims.

Agent Jones stated the defendant never indicated that his residence was damaged or that items were missing. The defendant also did not indicate that he owned a .22 caliber weapon. Agent

Jones recalled White's purse contained $30 and various credit cards, and Lorraine's purse contained $55 and credit cards.

Dr. Charles Harlan, who performed the autopsies on the victims, testified Lorraine Young suffered a gunshot wound to her right upper chest, which passed through her left lung and exited her body. Dr. Harlan did not recover a bullet. The doctor explained the entrance wound was consistent with a gunshot from a distance greater than two feet away. The doctor observed a scrape extending across her buttocks which was caused by her body being moved across a rough surface at or about the time of death. Dr. Harlan recovered two pieces of gravel from her back. The doctor opined she died as the result of a gunshot wound to the chest causing her to bleed to death internally. She would not have lost consciousness immediately, and it would have taken a period of time for her to die.

Dr. Harlan testified Shirley White suffered an entry gunshot wound to the back of her left hand with stippling around the wound, which indicated White was shot from close range. The bullet exited through the palm, reentered through her left collarbone, perforated her aorta causing extensive internal bleeding, and was recovered in the backbone. The doctor stated the gunshot wound would not have caused White to lose consciousness immediately. The doctor observed bruises on White's knees which occurred either prior to or at the time of death, and an artificial fingernail was missing from her left index finger. Dr. Harlan opined White died as the result of a near gunshot wound to the left hand and chest.

Dr. Harlan testified the wounds on the victims were not survivable. The doctor stated the wounds, other than the wound to White's hand, would not have necessarily resulted in a great amount of external bleeding. Dr. Harlan opined the victims were killed within twenty-four hours of the discovery of their bodies at 11:41 a.m. on November 7.

TBI Agent Qadriyyah Dedmon, a serology DNA analyst, testified she discovered White's blood on the following: a rug on the deck outside the kitchen door, a rug on the deck in front of a refrigerator, shoes on the deck, both victims' purses, White's clothes, the deck in front of the refrigerator, shoes inside White's vehicle, an area near the washing machine, and an area near the dishwasher. Agent Dedmon discovered Young's blood on two cabinets in the kitchen and the defendant's blood on a kitchen cabinet located near the telephone.

TBI Agent Shelly Betts, a forensic scientist assigned to firearms identification, testified that upon examining Young's shirt, she discovered evidence of gunpowder and bullet residue. Based upon this evidence, Agent Betts opined the bullet which killed Young was fired from a distance of less than one foot. Agent Betts testified agents recovered three boxes of .22 caliber ammunition from the defendant's residence, including a box labeled "CCI mini mag" for long rifles. Agent Betts stated the bullet recovered from White's body was a .22 caliber copper-coated lead bullet which was the same design and type of CCI bullets discovered inside the defendant's residence. FBI Agent Charles Peters testified four of the fifteen bullets which were tested from the box of CCI bullets were indistinguishable in composition from the bullet recovered from White.

The parties stipulated that in October 2002, the defense submitted a North American .22 caliber five-shot stainless steel revolver containing five live .22 caliber bullets to Agent Davis. The

firearm bore the same serial number as the number on an empty box which was found at the defendant's residence. Upon testing the firearm, Agent Betts concluded the bullet recovered from White's body had not been fired from this weapon.

DeWayne Chapman, an employee at the South Pittsburg Post Office, testified that when he delivered the defendant's mail between 11:30 a.m. and 1:00 p.m. on November 6, he did not observe anything unusual. Chapman acknowledged he had no independent recollection of delivering mail at the defendant's residence or which vehicles were present on that date.

Terry Smith, a semi-truck driver, testified that on Monday, November 6 at approximately 5:00 p.m., he parked his semi-truck at the Handy Man parking lot and drove his personal vehicle to his residence. Smith maintained he did not see White's vehicle in the parking lot. Smith returned to the parking lot the next morning at 8:15 a.m. and observed White's vehicle.

## I. SUFFICIENCY

The defendant contends the evidence presented at trial is insufficient to support his convictions for premeditated murder. Specifically, the defendant maintains the evidence, which was circumstantial, was insufficient to establish identity and premeditation. We disagree with the defendant's assertions.

### A. Standard of Review

This court does not reweigh or reevaluate the evidence in determining sufficiency. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). A jury verdict, once approved by the trial judge, accredits the state's witnesses and resolves all conflicts in favor of the state. State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994). Accordingly, the state is entitled to the strongest legitimate view of the evidence and all legitimate and reasonable inferences which may be drawn therefrom. *Id.* It is our duty to affirm the conviction if the evidence, viewed under the appropriate standards, was sufficient for any rational trier of fact to have found the essential elements of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); State v. Elkins, 102 S.W.3d 578, 581 (Tenn. 2003).

Although the evidence of the defendant's guilt is circumstantial in nature, circumstantial evidence alone may be sufficient to support a conviction. State v. Tharpe, 726 S.W.2d 896, 899-900 (Tenn. 1987); State v. Gregory, 862 S.W.2d 574, 577 (Tenn. Crim. App. 1993). The circumstantial evidence, however, must exclude every other reasonable theory or hypothesis other than guilt. Tharpe, 726 S.W.2d at 900. In addition, "it must establish such a certainty of guilt of the accused as to convince the mind beyond a reasonable doubt that [the defendant] is the one who committed the crime." *Id.* (citations omitted).

### B. Analysis

The applicable definition of first degree murder is "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Premeditation necessitates "a previously formed design or intent to kill," State v. West, 844 S.W.2d 144, 147 (Tenn. 1992) (citations omitted), and

"an act done after the exercise of reflection and judgment . . . [meaning] that the intent to kill must have been formed prior to the act itself." Tenn. Code Ann. § 39-13-202(d). It also requires that the accused be "sufficiently free from excitement and passion as to be capable of premeditation." *Id.*

## 1. Identity

The defendant first contends the evidence is insufficient to establish that he killed the victims. However, when viewed in a light most favorable to the state, the proof presented at trial established that the victims were killed inside the defendant's residence after White had argued with the defendant on the previous day. Agents discovered the blood of both victims inside the residence. Gravel found on the victims' bodies and "drag marks" on both sides of the gravel underneath the carport indicated the victims' bodies were dragged from the residence to White's vehicle. The residence appeared to have been cleaned, and agents discovered a wet rug inside the washer and a pair of the defendant's blue jeans and a shirt, both of which were still wet, inside the dryer.

Dr. Harlan testified the victims were killed within twenty-four hours of their discovery on November 7 at 11:41 a.m. Young was due to return to her residence on November 6 around noon. Tad Kirk, an employee at the Handy Man Home Center, observed White's vehicle in the parking lot as he was leaving work shortly after 3:00 p.m. The defendant's statement to the police indicated he was the last person to see the victims alive. The .22 caliber bullet recovered from White's body was the same design and type of CCI .22 caliber bullets found inside the defendant's residence. Further testing revealed some of the CCI bullets found in the defendant's residence and the bullet recovered from White's body were indistinguishable in composition.

Moreover, the defendant's various statements were inconsistent. The defendant told Kevin Young that the victims were at his residence eating cake when he went to the hospital for a doctor's appointment. The defendant informed law enforcement officials that his doctor's appointment was at 2:00 p.m. Other witnesses testified the defendant's appointment was at 2:20 and that he arrived at 2:15. However, the defendant informed law enforcement officials that he had last seen the victims around noon when he left to discard his trash into a dumpster.

Furthermore, the evidence does not suggest that the killings occurred during a burglary of the defendant's residence. Agents observed no evidence of a forced entry, and the defendant did not report any items missing from his residence. Moreover, agents discovered cash and credit cards inside the victims' purses. The defendant informed law enforcement officials that he was the only person, other than family members, inside of his residence from the last time he saw the victims until he learned of their deaths. We conclude this evidence is sufficient to establish the defendant's identity as the perpetrator.

## 2. Premeditation

The defendant asserts the evidence is insufficient to establish premeditation. The element of premeditation is a question of fact to be determined by the jury from all the circumstances surrounding the killing. State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances of the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Bordis, 905 S.W.2d 214, 222

(Tenn. Crim. App. 1995). Our supreme court delineated several circumstances that may be indicative of premeditation, including declarations of the intent to kill, procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, infliction of multiple wounds, the making of preparations before the killing for the purpose of concealing the crime, destruction or secretion of evidence, and calmness immediately after the killing. State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000). Other factors indicative of the existence of premeditation include the lack of provocation by the victim and the defendant's failure to render aid to the victim. State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000). The jury may also infer motive through facts regarding the defendant's prior relationship with the victim. State v. Sims, 45 S.W.3d 1, 8 (Tenn.), *cert. denied*, 534 U.S. 956 (2001); State v. Coulter, 67 S.W.3d 3, 48 (Tenn. Crim. App. 2001).

In Tennessee, when a homicide has been established at trial, it is presumed to be second degree murder, and the burden is on the state to prove the element of premeditation sufficient to raise the offense to first degree murder. State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999); State v. Long, 45 S.W.3d 611, 620-21 (Tenn. Crim. App. 2000). Specifically, the state must establish a "previously formed design or intent to kill," West, 844 S.W.2d at 147, which is sufficiently free from excitement and passion to constitute premeditation, Tenn. Code Ann. § 39-13-202(d).

We conclude that when viewed in the light most favorable to the state, the facts and circumstances as a whole are sufficient to support premeditation. *See* Davidson, 121 S.W.3d at 615 (analyzing the entire pattern of the defendant's conduct in concluding premeditation was sufficiently established). On the day prior to the victims' death, the defendant and White argued to such a degree that White spent the night at her brother's residence and arranged to stay there the following night. White went to retrieve her clothes from the defendant's residence. The offenses involved two separate victims who were shot after the defendant procured a weapon. The defendant shot both victims once in the upper region of their bodies. There is no indication that the victims were armed or otherwise provoked the attacks. After being shot, the victims did not die immediately; rather, they remained conscious for an indeterminate period of time. The defendant did not call an ambulance or otherwise render aid to the dying victims. Grandview Medical Center was only eleven minutes from the defendant's residence.

Furthermore, the defendant took actions to conceal evidence of the offenses. He dragged the victims' bodies to White's vehicle, drove to a parking lot, and abandoned the vehicle in the parking lot. The defendant cleaned his deck and residence, washed his clothes and a rug, and offered a false explanation for the victims' absence to their families. Following the killings, he kept his doctor's appointment, returned to a liquor store where he paid for his previous purchase, made an additional purchase, and represented to the victims' families that he was aiding in their search for the victims. We conclude this evidence, when viewed in its entirety, is sufficient to establish premeditation.

## II. PRICE'S TESTIMONY

The defendant submits the trial court erred in allowing Bill Price to testify that on Tuesday, November 7, Jim Johnson, who was deceased at the time of trial, was worried because Lorraine Young had told Johnson that she would meet him at her residence at 11:30 a.m. on the previous day

and would bring him cigarettes. However, we conclude the defendant is not entitled to relief on this issue.

The defendant contends Price's testimony is inadmissible double hearsay. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Tenn. R. Evid. 801(c). Hearsay within hearsay is excluded unless each of the statements falls within an exception to the hearsay rule. Tenn. R. Evid. 805. The state contends the statements were properly admitted as evidence of the two declarants' then existing state of mind. *See* Tenn. R. Evid. 803(3). We are unable to conclude Price's testimony falls within the state of mind hearsay exception.

The defendant further contends the admission of Price's testimony violated his right to the confrontation of witnesses. Recently, the United States Supreme Court held that, in order for an out-of-court statement which is testimonial in nature to be admissible in a criminal trial, the declarant must be unavailable and the defendant must have had a prior opportunity for cross-examination. Crawford v. Washington, __ U.S. __, __, 124 S. Ct. 1354, 1369, 158 L. Ed. 2d 177 (2004). However, where the issue involves nontestimonial hearsay, "it is wholly consistent with the Framers' design to afford to the States flexibility in their development of hearsay law." Crawford, 124 S. Ct. at 1374. In the case at bar, the state maintains the statements were nontestimonial in nature; thus, Crawford is inapplicable. We agree with the state.

Regardless, we conclude that any such error in admitting Price's testimony was harmless beyond a reasonable doubt. *See* State v. Sayles, 49 S.W.3d 275, 280 (Tenn. 2001). Price's testimony regarding the statements did not positively establish the time of the victims' death. Rather, Dr. Harlan testified the victims died within twenty-four hours of their discovery on November 7 at 11:41 a.m. Other testimony at trial established the approximate time frame for the homicides. Although the challenged statements conflicted with the defendant's representation to others that the victims left his residence at approximately noon to shop in Scottsboro, other witnesses testified White never mentioned any plan to travel to Scottsboro on that day. Furthermore, both the defendant's statement that the victims left at noon to go shopping in Scottsboro and his statement that the victims were eating cake inside his residence when he left for a doctor's appointment establish the defendant as the last known person to see the victims alive. The victims' vehicle was observed in the Handyman parking lot at approximately 3:00 p.m. that same day. Finally, during trial, the defense presented a police report which related Kevin Young's statement that Lorraine Young was due to return to her residence at 12:30 p.m. on November 6 in order to accompany her boyfriend in purchasing a table. This police report was admitted into evidence. Therefore, the defendant is not entitled to relief on this issue.

Accordingly, we affirm the judgments of the trial court.

_____
JOE G. RILEY, JUDGE

-11-