# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs April 19, 2016


## STATE OF TENNESSEE v. TIMOTHY ANDREW BISHOP

### Appeal from the Criminal Court for Davidson County
### No. 2014B936   Steve R. Dozier, Judge

_____

### No. M2015-00314-CCA-R3-CD – Filed December 16, 2016
_____


The Defendant, Timothy Andrew Bishop, appeals his convictions for two counts of child abuse, a Class D felony.  The Defendant challenges the trial court's admission of lay opinion testimony from a detective regarding the victim's bruises, the prosecutor's statements during closing argument, and the admission of a hearsay statement under the then existing state of mind exception. He also asserts on appeal that the trial court erred in admitting, under the excited utterance exception to the rule against hearsay, the victim's statements at school that the Defendant was responsible for his bruises.  After a thorough review, we conclude that the hearsay statements admitted as excited utterances were admitted in error and that the error was not harmless.  Accordingly, we reverse and remand for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed; Case Remanded**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Dawn Deaner, District Public Defender; and Emma Rae Tennent (on appeal), Jonathan F. Wing (at trial), and Andrew Ross (at trial), Assistant District Public Defenders for the Appellant, Timothy Andrew Bishop.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Glenn Funk, District Attorney General; and Brian Holmgren and Tali Rosenblum, Assistant District Attorneys General, for the Appellee, State of Tennessee.

# OPINION

## FACTUAL AND PROCEDURAL HISTORY

The Defendant was charged with child abuse after his son, the five-year-old victim, arrived at school after the 2012 Thanksgiving break with a variety of bruises and other injuries covering his face. The victim lived with the Defendant and with his paternal grandmother. At the time of the charged offenses, the victim's mother had been deceased for several years. The victim, who was described by several witnesses as very physically active and sometimes hyperactive, started kindergarten in the fall of 2012. On September 4, 2012, the victim and another child collided on the playground at school, and the Defendant took the victim to the hospital for the resulting cut on his forehead, which required stitches. The records from this hospital visit were introduced into evidence, showing that the victim sustained a laceration above his left eyebrow. The victim's medical records also showed that he made a hospital visit on January 20, 2012, after falling on a toy box at home and cutting his nose.

The victim's kindergarten teacher, Amanda Mullins, testified that the victim's appearance was normal prior to the school's Thanksgiving break that year. School was out for the holiday on Thursday, November 22nd, and Friday, November 23rd.

On Monday, November 26th, the victim did not come to school but went to see a nurse practitioner, Irene Bean. Nurse Bean testified that the Defendant brought the victim to see her because the victim had a sore throat. Nurse Bean initially testified that the victim did not have strep throat. On cross-examination, she looked at her records and testified that she performed a test and diagnosed the victim with strep throat, for which she administered an antibiotic. She provided the victim with a note excusing him from two days of school.

Nurse Bean noticed that the left side of the victim's face was very red. The Defendant and victim explained that the victim had fallen off of a swing at a playground while playing with friends. The two said they were coming from the park on the day of the office visit but did not say what day the fall from the swing had occurred. Nurse Bean documented the healed injury above the victim's eyebrow that was the result of the September 4th collision on the playground at school. She testified that the Defendant described the accident on the playground and stated that "that the school was quick to blame parents for abuse" but that it had not informed him that the victim had been hurt in the collision with a child at school until he came to pick up the victim.

Nurse Bean's report notes that the victim had redness on his left cheek and abrasions to his face, as well as a laceration above his left eyebrow. The report states that

she found no further abrasions, bruises, or lacerations. Nurse Bean testified that it was her policy to document any injuries and that she would have done so if she had seen any further injuries. She testified that the victim did not have a bruise on the right side of his face and that he did not have an abrasion under his chin. Nurse Bean looked at a photograph of the victim taken on Wednesday, November 28th, and testified that the left side of his face exhibited a patterned bruise in the photograph but that it had been merely red when he came to see her. She testified that the bruise appeared to be a handprint and that if she had seen the bruise, she would have been required to inform the Department of Children's Services ("DCS"). On cross-examination, Nurse Bean acknowledged that at the time of the victim's November 26th visit, she did not document the healed scar on his nose which was apparent in the November 28th photograph. She testified that if the laceration above the victim's eyebrow had been present during a prior visit he made to her office in October, she would have documented it and that she concluded he did not have the injury at the time. Medical records show that the injury was sustained on September 4th.

The victim returned to school on Wednesday, November 28th. Ms. Mullins immediately noticed bruising on both the left and right side of his face. When she asked him what happened, he told her that he had fallen off of a swing. Ms. Mullins was concerned and told the assistant principal, Elizabeth Goetz, about the victim's injuries. Ms. Goetz took the victim out of class and walked him to the school counselor's office, where he was asked about the injuries to his face.

The victim, who was seven years old at the time of trial, testified that the Defendant did not inflict any of the injuries depicted in the photographs. The victim stated he was in court because he "wasn't careful." He elaborated that he was running, bumped into a child, and hurt his eyebrow. He stated that the accident happened at a playground near his house and not at school. The victim testified that he had hurt the left side of his face falling off a swing, that he hurt his chin falling off of a bicycle, and that he did not recall how he got the other injuries, including red marks on his face and ear or bruising on the right side of his face. He stated that the Defendant was with him but out of sight when he fell from the swing and that "one of the swings w[as] broken and I -- my hands slipped." He testified that he fell forward from the swing and that his face hit the ground. He identified the swing he fell from in a photograph and stated that there were leaves beneath the swing. He testified that he got stitches for the abrasion on his chin. He also described falling on a toy box and having to get stitches on his nose.

The victim testified that he did not remember Ms. Mullins, the school counselor, or an assistant at the school named Michelle Hardy. He stated that he did not recall talking with any of those people or with police about how his face was injured. He testified he never told anyone that the Defendant had slapped him. He later recalled that

he had seen a witness for trial outside the courtroom and that she had worked in the cafeteria at his school. He stated that he never told this witness that the Defendant hit him, that the Defendant told him not to tell, or that he was afraid. He also did not recall telling her at a prior proceeding that he was angry with a DCS worker or talking with her about telling lies about the Defendant. He did not recall being sick at Thanksgiving and did not recall having to stay away from his home for a period of time. He testified that the Defendant did not cause any of his injuries. He stated he had not seen the Defendant in a year and that he missed him. He denied that the Defendant tried to influence his testimony.

The State attempted to introduce statements that the victim made to several witnesses to the effect that the Defendant had caused the injuries by hitting him. The trial court permitted the parties to question the witnesses outside the presence of the jury to determine if their testimony would be admissible. The victim's first disclosure was to Michelle Hardy, who worked in the front office and supervised lunch in the cafeteria. Ms. Hardy testified that she and the victim had a close bond and that the school counselor asked her to speak to him because the counselor "couldn't get anything out of him" and "he wouldn't say anything."

Ms. Hardy testified that she took the victim to a separate table in the cafeteria where she could talk to him privately. She asked him, "[D]o you love me?" The victim said he did, and Ms. Hardy took his hands and asked him to look at her. Ms. Hardy told him, "I can't protect you if you don't tell me, if you don't just talk to me." At that point, the victim told her, "[M]y daddy slapped me." He also told her that the Defendant had told him not to tell and that he was scared. Ms. Hardy described his demeanor as "He was -- he was like he was scared. He was like, I was told not to say it[,] but that's what happened." She stated that he appeared frightened or hesitant to tell. Ms. Hardy stated that the victim was hesitant to talk with her and at first would not make eye contact. After he told, the victim appeared "still scared" but also "relieved." Ms. Hardy testified that the victim told her that the Defendant was upset with him but did not mean to do it. She testified that she spoke to him for about ten minutes about the injuries. Ms. Hardy stated, "[I]t took a few minutes before he finally told me."

After the disclosure, Ms. Hardy immediately asked the victim to repeat what he had said to Janice Thomas, a paraprofessional teacher's assistant. The victim told Ms. Thomas that the Defendant had "smacked" him. Ms. Hardy described his demeanor as: "It was, you know, just like, okay, I've already let it off my chest, Ms. -- you know, it was just like a tone." Ms. Thomas testified that the victim "wasn't upset … it was more like solemn."

The trial court decided to admit the victim's statements to Ms. Hardy and Ms. Thomas under the excited utterance exception to the rule prohibiting hearsay. The court

also admitted the victim's statement that he was scared under the then existing state of mind exception.

George Merkel,[1] a case manager with DCS, met with the victim after he had spoken with Ms. Hardy and Ms. Thomas. Mr. Merkel first spoke with the school counselor and Ms. Hardy and Ms. Thomas, who relayed the information that the victim had told them to Mr. Merkel. Mr. Merkel testified he spoke to the victim approximately forty-five minutes after his 12:39 p.m. arrival. Mr. Merkel questioned the victim, who stated he fell out of a swing set. He spoke with the victim for fifteen minutes to establish a rapport, and the victim told him he had been sick and had gotten a shot. Mr. Merkel then asked the victim if he knew the difference between the truth and a lie, and the victim said he did. He then asked the victim to give an example of each, and the victim did. He then said to the victim, "so if I told you that you fell out the swing and that's how you hurt your face, would that be the truth or a lie?" The victim responded, "[M]y dad slapped me."

Ms. Mullins testified that when the victim returned to her class on that Thursday or Friday, she asked him several times what had happened to his face. At first, he stated that he fell from a swing. He then stated that he had been accidentally injured in a different way which Ms. Mullins could not recall. Finally, he said, "My daddy did it."

The trial court allowed Mr. Merkel and Ms. Mullins to testify regarding the victim's statements with a limiting instruction that the jury should consider the testimony for impeachment purposes only.

Ms. Goetz, the assistant principal, also heard the victim say that the Defendant had hit him. Ms. Goetz testified that she took the victim from his classroom to the counselor and was aware that the police and DCS had become involved. She testified that as part of her job, she would occasionally accompany a student home on the bus if the student was having a behavioral issue. The victim was to ride the bus home after school that day. Ms. Goetz testified that the victim had been calm in the morning when she saw him. She testified that at dismissal, the victim realized he would go home on the bus after having been questioned all day. At that point, the victim was very "agitated" and "upset." On the bus ride, the victim was kicking, hitting, trying to run, and trying to crawl under the seat to get away. Ms. Goetz testified she had to hold him in the seat to prevent him from escaping and that the victim would attempt to hit any child trying to peek over the seat. She testified that the other children asked him what had happened to his face, and he responded that the Defendant had hit or slapped him or that the Defendant had done it.

---

[1] The record is inconsistent regarding the spelling of Mr. Merkel's name. We have chosen to use the spelling in the indictment.

She stated, "Once it came out one time, you could tell it was almost like it broke a seal and he just said it over and over." The victim was "[s]till like a trapped animal, just hitting, kicking, jumping, just out of control" when he made the disclosure on the bus. Ms. Goetz exited the bus with the victim and motioned his grandmother to come across the street because she was afraid the victim might run away if she let go of his hand. The trial court did not permit Ms. Goetz to testify about the victim's statements implicating the Defendant at all, despite the State's raising the issue multiple times and offering to call Ms. Goetz again. Ms. Goetz testified at trial about riding home with the victim, who was agitated, trying to run, and trying to hit the children who were looking at him.

Ms. Hardy's testimony to the jury was consistent with her testimony outside the jury's presence. She stated that, after asking the victim if he loved her and telling him she could only protect him if he told the truth, he said that the Defendant slapped him and told him not to tell. Ms. Hardy asked the victim how it made him feel, and he said he felt scared. She stated his demeanor was "scared but, you know, it was like after he told somebody, it's like he was glad somebody knew, or he was relaxed and calm." She testified that the victim had seen her in the hallway on the first day of trial and had given her a hug and said he remembered her. Ms. Hardy did not recall telling Mr. Merkel that the victim had first told her he fell off of a swing.

Ms. Thomas's testimony in front of the jury was also consistent with her jury-out testimony. She stated that she had removed a child from the class table in the cafeteria because he was disruptive and that she sat at the far end of the same table occupied by the victim. Ms. Hardy was standing nearby and told the victim to tell Ms. Thomas what he had told her, and the victim said that his daddy had "smacked" him. He had a red mark on his face. Ms. Thomas offered some words of consolation but then immediately returned her attention to the student she was helping.

Mr. Merkel testified that he met with the victim between 1:00 and 2:00 p.m. and that the victim was hyperactive and having trouble focusing. The counselor gave the victim a puppet to help him calm down and direct his attention. Mr. Merkel then testified regarding how the victim had initially said he fell out of a swing but, after the conversation regarding the difference between a truth and a lie, told Mr. Merkel that the Defendant had "slapped" him. The victim elaborated that the Defendant was angry because the victim was supposed to wait inside and had instead gone outside. The victim was also concerned about whether the Defendant would find out about his conversation with Mr. Merkel. Mr. Merkel stated that the victim was "concerned about whether he would be allowed to go home today after school and he also asked me if I would be at his house when he got there." Mr. Merkel left the school around 2:30 p.m., and he and Detective Bret Kenney went to the victim's residence. The victim's grandmother called the Defendant, and the Defendant returned home. The victim arrived shortly thereafter.

Mr. Merkel and Detective Kenney spoke with the Defendant. Mr. Merkel testified that the Defendant was agitated, loud, and intimidating during the meeting. The Defendant stated that the victim had fallen out of a swing in a park near their home. The Defendant did not say anything about the victim falling off of a bicycle or onto a box spring. The Defendant did refer to the scar on the victim's nose, which he stated had been caused by a toy box. Mr. Merkel stated that the Defendant kept trying to direct the conversation to the victim's September 4th injury above his eye, asking for an investigation of what had happened at school. The Defendant denied slapping the victim and stated that anyone who slapped his or her child should be prosecuted. Mr. Merkel testified that the Defendant never identified anyone else responsible for disciplining the victim.

Mr. Merkel testified that he spoke with his supervisor regarding the victim's placement and decided to put an immediate protection agreement into place, whereby a friend or relative could keep the victim for his safety. Mr. Merkel spoke with his supervisor in his car around 6:00 p.m., and he saw the Defendant take the victim down the street. Mr. Merkel called the Defendant's name, and the Defendant returned to the house with the victim. After the Defendant was told about the temporary placement, he stated he needed to go into the house to call someone. Mr. Merkel followed two minutes later with paperwork only to discover that the Defendant had left with the victim. The Defendant called around 6:20 p.m., very agitated, and stated that he was taking the victim to his brother's house and would not allow his child to be taken away. Mr. Merkel called the Defendant's brother and explained the situation. The Defendant contacted Mr. Merkel the next day.

A portion of a videotaped hearing, which took place in juvenile court on December 10, 2012, was introduced. At the hearing, the Defendant stated that the victim fell from a swing on November 23rd and injured his face. When asked about the other bruises, he stated that the injury on the victim's chin was from falling on the edge of a box spring mattress on Sunday, November 25th. He then stated that other bruising came from a fall off a bicycle on Saturday, November 24th. He stated he did not know why the victim would say he had been hit by the Defendant.

On cross-examination, Mr. Merkel testified that Ms. Hardy told him that the victim had initially told her that he was injured falling off of a swing. Mr. Merkel also stated that the Defendant told him that the injury on the swing took place on Friday, November 23rd, and not Friday, November 16th. The victim was placed briefly in foster care but returned to the Defendant and grandmother on December 10, 2012. Mr. Merkel confirmed that the victim stated in a forensic interview that he hurt his face falling from a swing. On redirect examination, Mr. Merkel testified that the victim was living with his

uncle, the Defendant's brother, at the time of the forensic interview. The victim never stated he fell off of a bicycle or onto a box spring. Mr. Merkel stated that the Defendant continued to have contact with the victim while the victim was not living with the Defendant.

Detective Bret Kenney also spoke to the victim at school and accompanied Mr. Merkel to the Defendant's residence. Detective Kenney testified that the victim said that he received the mark on the left side of his face from falling off of a swing and then later stated the other marks were from falling off of or hitting a slide. The victim also told Detective Kenney that he was not sick but that the Defendant said he was sick and kept him home. Detective Kenney testified that the Defendant explained the victim's injuries by saying that he was pushing the victim on a swing and the victim fell off of the swing. According to Detective Kenney, the Defendant described the victim falling backward off the swing. When Detective Kenney noted that the injuries were not to the victim's back, he stated that the victim fell backward but that his head was turned to the side. Detective Kenney photographed the playground where the Defendant said the victim was injured. The swings were not broken, and there were wood chips and leaves underneath them. Detective Kenney also testified that the Defendant stated the injury occurred on Friday, November 16, 2012. He did not say the victim fell forward or that he fell on Friday, November 23, 2012. Detective Kenney also observed the Defendant interact with the victim at their home after the victim arrived on the bus. The Defendant placed the victim in the living room while he spoke with Detective Kenney and Mr. Merkel in the kitchen, and Detective Kenney saw the Defendant "yell" and "chastise" the victim when he came to the kitchen out of curiosity. The Defendant became confrontational and upset as he was asked about five injuries on the victim, and he denied striking the victim. The Defendant told Detective Kenney that no one else was responsible for disciplining the victim. The Defendant would not sign a medical release. Detective Kenney asserted that his report contained a typographical error where it stated that the Defendant said the victim fell on November 23rd. He testified that the Defendant told him the fall occurred on November 16th and that the victim's grandmother stated she noticed the injuries on November 17th.

Detective Kenney acknowledged that his report did not reflect the fact that the victim said he fell off a slide. He acknowledged that in the forensic interview, the victim did not say that the Defendant caused the injuries. He also acknowledged that it was possible that his report was accurate and the Defendant told him the victim was injured on November 23rd.

The State asked to have Detective Kenney testify that the mark on the victim's left cheek was a handprint. The defense objected on the basis of notice if Detective Kenney's testimony was admitted as expert testimony and also on the basis that only a medical

expert could testify that the mark looked like a handprint. The trial court initially sustained the objection regarding Detective Kenney's testimony about what caused the mark. The State then asked to present an offer of proof regarding the Detective's expert qualifications. Detective Kenney testified that he had seen "hundreds and hundreds" of photographs of non-accidental injuries where the cause of the injury was corroborated by evidence other than the injury itself. He testified that he had recently received training on recognizing pattern injuries and had at least three hours of recent training in that field. He did not have any medical training or any publications in the field. Detective Kenney stated he had personally handled more than twenty cases where a handprint was observed on a child. The Defendant argued that the testimony invaded the province of the jury. The trial court chose to qualify Detective Kenney as an expert. The defense then asked that, instead of testifying as an expert, the Detective be permitted to testify regarding the marks without being qualified as an expert before the jury. Detective Kenney testified in front of the jury about his qualifications and gave a lay opinion that the marks on the victim were suggestive of a handprint.

LaTonya Dyer, a resource officer stationed at the neighboring middle school, responded to the victim's school and contacted an officer to take photographs to document the victim's injuries. She spoke with the victim, and he told her he fell off the slide, and then added, "[O]h, yeah, and a swing."

In closing argument, the prosecutor noted that the jury would have to decide whether the victim's in-court testimony was credible. The defense reminded the jury that the victim had testified that the Defendant did not cause his injuries. In rebuttal, the prosecutor stated, "Our job as prosecutors of child abuse is to extol the credibility of children, to demonstrate why they are reliable historians when they talk in forensic interviews, when they talk to social workers, when they talk to police officers, when they make an outcry of abuse." The defense did not object to the statement. The prosecutor then stated, "For somebody who is an advocate for children to have to impeach and cross examine a child witness, that's not fun. That's the job actually that [defense counsel] actually have –[.]" The defense objected to this statement, and the trial court sustained the objection.

The jury convicted the Defendant as charged of one count of child neglect[2] and of two counts of child abuse, with the injury to the left side of the victim's face constituting Count One and the injury to the right side of the victim's face constituting Count Two, The child neglect count was merged into the child abuse counts, and the trial court

---

[2] A second count of child neglect, alleging acts which took place after the victim was temporarily removed from the defendant's custody, was severed.

aligned the sentences concurrently for an effective sentence of four years. The Defendant appeals the convictions.

## ANALYSIS

On appeal, the Defendant asserts that the testimony of Detective Kenney regarding the pattern of the victim's bruise was admitted in error, that he is entitled to reversal based on the prosecutor's closing remarks, that the trial court erred in allowing Ms. Hardy to testify that the victim said he felt afraid under the state of mind exception to the rule against hearsay, and that it erred in allowing the testimony of Ms. Hardy and Ms. Thomas under the excited utterance exception to the rule against hearsay.

### I. Opinion Testimony

The Defendant objects to the testimony of Detective Kenney that the bruise on the victim's face was consistent with a handprint pattern. The State sought to have Detective Kenney testify about the bruise, and the defense objected. After an offer of proof during which Detective Kenney testified regarding specialized training he had received in identifying pattern injuries on children, the trial court decided to allow the testimony as expert testimony. The Defendant, seeking to minimize the impact on the jury, asked that the Detective be allowed to give the testimony as lay opinion testimony. The testimony was accordingly presented to the jury as lay testimony.

The decision to admit or exclude evidence is entrusted to the trial court's discretion. *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004). More particularly, a trial court's decisions regarding the admissibility of opinion evidence are reviewed for abuse of discretion. *State v. Schiefelbein*, 230 S.W.3d 88, 130 (Tenn. Crim. App. 2007). A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical or unreasonable conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party. *State v. Herron*, 461 S.W.3d 890, 904 (Tenn. 2015).

The Tennessee Rules of Evidence allow for expert witnesses to give opinion testimony:

> If scientific, technical, or other specialized knowledge will
> substantially assist the trier of fact to understand the evidence
> or to determine a fact in issue, a witness qualified as an expert
> by knowledge, skill, experience, training, or education may
> testify in the form of an opinion or otherwise.

Tenn. R. Evid. 702. Generally, the Rules require a determination of the scientific validity and reliability of the evidence. *McDaniel v. CSX Transp., Inc.,* 955 S.W.2d 257, 265 (Tenn. 1997). Nonscientific, specialized knowledge must be relevant and reliable, as measured by any of the *McDaniel* factors that are applicable, by the expert's qualifications, and by the straightforward connection between the expert's knowledge and the basis for the opinion. *State v. Stevens*, 78 S.W.3d 817, 834-35 (Tenn. 2002); *see also State v. Sona Marie Cauldwell*, No. 03C01-9305-CR-00149, 1994 WL 111060, at *4 (Tenn. Crim. App. Mar. 25, 1994) (concluding that the trial court did not abuse its discretion in allowing a caseworker with the Department of Human Services, who had had training and experience regarding bruising, to testify as an expert to the age of the victim's bruises).

The Defendant argues that the trial court erred in ruling that the testimony would be admissible as expert testimony. We note that, insofar as the Defendant objects to the admission of the testimony as lay testimony under Tennessee Rule of Evidence 701, he acquiesced in the trial court's decision. The Defendant notes that this acquiescence was prompted by the prior ruling determining that the testimony could come in as expert testimony. We conclude that, in any event, if the opinion was properly admitted as a lay opinion and was likewise presented to the jury as a lay opinion, then the Defendant cannot premise relief on the court's previous decision to admit it as expert testimony.

A non-expert witness may give testimony in the form of opinion or inference if it is: "(1) rationally based on the perception of the witness" and "(2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Tenn. R. Evid. 701(a). Lay opinion testimony should be based on admissible facts which are in evidence. *State v. Boggs*, 932 S.W.2d 467, 474 (Tenn. Crim. App. 1996). To be admissible, a lay opinion should be within the range of knowledge or understanding of ordinary laymen. *Id.* A witness's lay opinion testimony is admissible when the jury could not readily draw its own conclusions on the issue without the witness's lay opinion or where the witness cannot effectively testify without stating the inference or opinion. *Schiefelbein*, 230 S.W.3d at 130. "If an opinion is based upon a lay witness's own observations, his or her conclusions require no expertise and are within the range of common experience, the opinion is admissible." *State v. Samuel*, 243 S.W.3d 592, 603 (Tenn. Crim. App. 2007). "The distinction between an expert and a non-expert witness is that a non-expert witness's testimony results from a process of reasoning familiar in everyday life and an expert's testimony results from a process of reasoning which can be mastered only by specialists in the field." *State v. Brown*, 836 S.W.2d 530, 549 (Tenn. 1992); *see State v. Brice Cook*, No. W2012-00406-CCA-R3-CD, 2013 WL 9570493, at *8 (Tenn. Crim. App. Sept. 4, 2013) (listing examples of lay testimony). When the lay testimony attempts to introduce facts which are numerous and difficult to describe but "the conclusion or inference to be drawn from such facts is simple and well within the

range of common experience," testimony permitting the conclusion should be admitted. *Nat'l Life & Acc. Ins. Co. v. Follett*, 80 S.W.2d 92, 98 (Tenn. 1935) (permitting lay opinion testimony that a disturbed spot in the snow "looked as if made by some one who had slipped").

In *Samuel*, a witness testified that a mark on the victim looked "recent" and looked like someone had dug a fingernail into the victim's skin. *Samuel*, 243 S.W.3d at 603. This court permitted the testimony as a lay opinion, noting that the age of a mark where a fingernail was dug into skin was within the common knowledge of the general public. *Id.* (noting also that Tennessee common law traditionally permitted lay testimony regarding the physical condition of the witness or another person). In *Brown*, a nurse who was not qualified as an expert by the trial court testified that she identified an injury as a cigarette burn based on having seen other such injuries on numerous occasions over six years. *Brown*, 836 S.W.2d at 549. The court concluded that the nurse's testimony fell in the category of opinion which "describes the witness's observations in the only way in which they can be clearly described," analogous to a description that a substance appeared to be blood or that a mark in the snow looked like someone had slipped. *Id.* at 550. The same court, however, found that a paramedic's testimony that a bruising around a child's eyes in a "coon eyes" pattern indicated skull trauma should not have been admitted as lay opinion because it called for specialized skill or expertise. *Id.* at 549, 550.

Relying on *Brown*, this court has found that a pediatrician could properly testify that bruises on a child looked like finger and shoe prints "[b]ecause a lay witness could have offered the same opinions without error." *State v. Thomas Fancher Greenwood*, No. M2013-01924-CCA-R3-CD, 2014 WL 6609308, at *33 (Tenn. Crim. App. Nov. 21, 2014), *perm. app. denied* (Apr. 10, 2015). The court also concluded that a law enforcement officer's testimony that the same marks were fingerprints was properly admitted. *Id.* at *34. Other opinions have also admitted lay testimony regarding bruising. *See State v. Jeffrey Scott*, No. W2009-00707-CCA-R3-CD, 2011 WL 2420384, at *24 (Tenn. Crim. App. June 14, 2011) (allowing lay testimony that injury looked like a shoe print).

Detective Kenney testified that he had numerous hours of training in identifying patterned bruises and that he had seen approximately twenty "handprint" bruises as an investigator. He testified that the marks on the victim looked like handprints. The opinion was rationally based on his perception and helpful to the determination of a fact in issue. The testimony utilized a process of reasoning familiar in everyday life rather than a process of reasoning which could be mastered only by specialists in the field, and similar lay opinion testimony has been admitted in other cases. *See Brown*, 836 S.W.2d at 550; *Jeffrey Scott*, 2011 WL 2420384, at *24. We conclude that the trial court did not abuse its discretion in permitting the testimony, and we note parenthetically that the

testimony was, in any case, cumulative of Nurse Bean's testimony that the mark in the photograph was a handprint.

## II. Prosecutorial Misconduct

In closing argument, the defense suggested that the jury should credit the victim's statements from the stand rather than the statements he had made to Ms. Hardy and Ms. Thomas. Defense counsel argued that "when [the victim] was under oath in front of you all, … he told the truth." In rebuttal, the prosecutor noted that sometimes the disclosures made by children were very small. The prosecutor stated, "Our job as prosecutors of child abuse is to extol the credibility of children, to demonstrate why they are reliable historians when they talk in forensic interviews, when they talk to social workers, when they talk to police officers, when they make an outcry of abuse." The Defendant also refers in his brief to the prosecutor's description of the prosecution as an "advocate for children." The Defendant argues that the prosecutor's statement in rebuttal functioned to improperly vouch for the credibility of the State's witnesses and for the prosecutor's personal expertise and that it functioned to improperly suggest that the Defendant's guilt had been established.

Closing argument is a valuable privilege that should not be unduly restricted. *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001). Lawyers are expected to be zealous advocates and should be given great latitude in both the style and substance of their arguments. *State v. Banks*, 271 S.W.3d 90, 130-31 (Tenn. 2008). Closing argument must remain, however, temperate, predicated on the evidence adduced at trial, and pertinent to the issues. *State v. Jordan*, 325 S.W.3d 1, 64 (Tenn. 2010). While the prosecutor "may strike hard blows, he is not at liberty to strike foul ones." *Id.* (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). The prosecutor may not, for instance, engage in derogatory remarks or name calling. *Bane*, 57 S.W.3d at 425. The trial court has substantial discretion in controlling the course of arguments and will not be reversed unless there is an abuse of that discretion. *Id.*

There are five general areas of prosecutorial misconduct in closing argument: 1) intentionally misstating evidence or misleading the jury regarding inferences it may draw; 2) expressing personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant; 3) using argument calculated to inflame the passions or prejudices of the jury; 4) using argument which would divert the jury from its duty to determine facts based on evidence by interjecting issues broader than the guilt or innocence of the accused or by making predictions regarding the consequences of the verdict; 5) intentionally referring to or arguing facts outside the record unless they are matters of common public knowledge. *State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

"A criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument." *Banks*, 271 S.W.3d at 131. Generally, impropriety in closing statements is evaluated to determine whether the conduct affected the verdict to the defendant's prejudice. *Bane*, 57 S.W.3d at 425; *compare State v. Jackson*, 444 S.W.3d 554, 590-91 (Tenn. 2014) (holding that in cases of constitutional error in closing argument, the State must prove that the error was harmless beyond a reasonable doubt). The court considers: 1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; 2) the curative measures undertaken by the court and the prosecution; 3) the intent of the prosecutor in making the improper statement; 4) the cumulative effect of the improper conduct and any other errors in the record; and 5) the relative strength or weakness of the case. *State v. Larkin*, 443 S.W.3d 751, 813 (Tenn. Crim. App. 2013).

Although the State does not argue that the Defendant waived the issue of prosecutorial misconduct, we note that there was no objection at the time of trial to the statement which is the central focus of the Defendant's appellate argument. An issue raised not raised in front of the trial court is generally considered waived. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *State v. James Rae Lewter*, No. M2010-01283-CCA-R3-CD, 2011 WL 1197597, at *4 (Tenn. Crim. App. Mar. 31, 2011) ("[W]e agree that Lewter has waived this issue by failing to make a contemporaneous objection to the prosecutor's [closing] remark at trial."). The defense did object after the prosecution's statement that it was an "advocate for children," and this objection was sustained by the trial court.

Notwithstanding waiver, we conclude that the Defendant is not entitled to relief on this basis. The prosecutor's statements concerned the role of the prosecution as an advocate for victims. While the statements could be read to imply that the victim's disclosures should be credited and while a discussion of the role of prosecutors lies outside the facts in the record, there was no showing that the verdict was affected to the Defendant's prejudice. The argument was made in the context of rebutting the Defendant's argument that the victim's in-court testimony exonerating the Defendant should be credited. The prosecution's intent was to respond to defense counsel's statement that "when [the victim] was under oath in front of you all, … he told the truth." The Defendant did not object to the first statement and so cannot complain of the lack of curative measures. With regard to the other statement, the trial court properly sustained the Defendant's objection to the statement that the prosecution acted as an advocate for children and that it the job of the defense to cross-examine child witnesses. No curative instructions were requested or given. However, the prosecutor, defense counsel, and the

-14-

trial court all noted at various times that the jury, exclusively, must determine the credibility of witnesses. While the evidence in this case was not particularly strong, the statements concerned the role of the prosecution and defense in general and were not inflammatory or outrageous. We conclude that they did not affect the verdict to the Defendant's detriment.

### III. Hearsay

The Defendant asserts he was prejudiced by the admission of certain hearsay statements. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is generally not admissible. Tenn. R. Evid. 802. A trial court's findings of fact or credibility determinations underlying a decision to admit or exclude hearsay are binding on an appellate court unless the evidence preponderates against them. *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). The appellate court reviews de novo the determination of whether the statement is hearsay or whether it is subject to an exception to the rule against hearsay. *Id.* We review for abuse of discretion the determination to exclude otherwise admissible hearsay based on relevance or on a balancing of probative value and prejudice under Tennessee Rule of Evidence 403. *Id.*

### A. State of Mind

The Defendant argues that the trial court erred in allowing Ms. Hardy to testify that the victim told her he felt scared. Ms. Hardy testified that the victim told her that he received his injuries from the Defendant and that the Defendant told him not to tell, and she asked him how he felt. The victim replied that he felt "scared." The Defendant objected to the testimony that the victim stated he was in fear, but the trial court permitted it under the exception to prove the victim's mental state.

Tennessee Rule of Evidence 803 contains exceptions to the rule against hearsay, including the declarant's then existing state of mind. This exception allows the admission into evidence of "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will." Tenn. R. Evid. 803(3). This exception makes admissible "declarations of mental state … to prove mental state at issue or subsequent conduct consistent with that mental state." Tenn. R. Evid. 803(3), Advisory Comm'n Cmt. Hearsay statements under the exception may not be admitted to prove

past conduct. *Id.* "The Commission contemplates that only the declarant's conduct, not some third party's conduct, is provable by this hearsay exception." *Id.*

This court has held that evidence under this Rule is only admissible when the declarant's state of mind would be relevant. *State v. Burns*, 29 S.W.3d 40, 47 (Tenn. Crim. App. 1999). In *State v. Long*, 45 S.W.3d 611 (Tenn. Crim. App. 2000), the victim had stated to law enforcement that the defendant would kill her if he found out she had revealed the location his marijuana plants. *Id.* at 622. This court concluded that the hearsay was improperly admitted because it was primarily used to prove that the defendant subsequently killed the victim and not to show the victim's state of mind. *Id.* at 623.

Statements that the victim fears the defendant are admissible if the victim's state of mind is relevant. In *State v. Trusty*, 326 S.W.3d 582, 602 (Tenn. Crim. App. 2010), the trial court admitted hearsay statements that the victim was afraid of the defendant under the then existing state of mind exception. This court concluded that the evidence was properly admitted as relevant to her state of mind and to show her probable behavior, such as willingness to accompany the defendant in her vehicle. *Id.* at 603. In *Burns*, this Court concluded that the victim's fearful reaction to hearing the defendant's name would have been admissible to show the victim's state of mind, but it could not be admitted under this exception because the victim's state of mind was not at issue and the evidence would not be relevant. *Burns*, 29 S.W.3d at 47. In *State v. Leming*, 3 S.W.3d 7, 18 (Tenn. Crim. App. 1998), this court concluded that the statements of the victim that he feared the defendant could not be admitted because the victim's state of mind was not relevant to any issue at trial.

The Defendant argues that the statement here was actually used to prove the Defendant's conduct and that the victim's state of mind was not relevant to any issues on trial. However, there is no indication that the exception was applied to show some subsequent conduct on the part of the Defendant in violation of the Rule. The victim offered inconsistent explanations for his injuries, and the jury was tasked with determining which, if any, of the explanations identified the cause of the bruising on the victim's face. The State's theory was that the victim was not being truthful when he stated, to school officials and at trial, that he fell from a swing. The victim's fear was relevant to explain why he might give untrue accounts of how he had been injured and to assist the jury in determining which account was true. Accordingly, unlike the cases cited by the Defendant, the victim's state of mind was relevant to issues to be determined at trial. As noted above, testimony that the declarant was in fear is admissible under the exception if the declarant's state of mind is relevant to the issues at trial. *Burns*, 29 S.W.3d 40, 47. While a limiting instruction might have been appropriate, *see Trusty*, 326 S.W.3d at 602-03, the Defendant did not request one. The testimony was properly

admitted under the exception because it was relevant to the victim's motivations to give inconsistent accounts of his injuries, and we discern no error.


## B. Excited Utterance

The Defendant next argues that the convictions rest on the testimony of Ms. Hardy and Ms. Thomas that the victim told them that the Defendant had hit him, causing the injuries. The Defendant claims that both these statements were admitted in error under the excited utterance exception to the testimony against hearsay.

Another exception to the rule prohibiting hearsay is a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Tenn. R. Evid. 803(2). In order for the exception to apply (1) there must be a startling event or condition that causes the stress of excitement; (2) the statement must relate to the startling event or condition; and (3) the statement must be made while the declarant was under the stress of excitement. *State v. Land*, 34 S.W.3d 516, 528-29 (Tenn. Crim. App. 2000). The rationale behind the exception is that (1) because the statement is made spontaneously in response to a startling event, there is little opportunity for reflection or likelihood of fabrication and (2) that the statement will accurately reflect events while they are fresh in the declarant's mind. *State v. Gordon*, 952 S.W.2d 817, 819-20 (Tenn. 1997). The declarant must also have personal knowledge of the facts in the hearsay statement in order for the exception to apply. *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). The statement ought to be so spontaneous that it "preclude[s] the idea of deliberation and fabrication." *State v. Smith*, 857 S.W.2d 1, 9 (Tenn. 1993).

The application of the exception requires that there be a startling event or condition. "The startling event need not be the act that gave rise to the legal controversy." *Kendrick*, 454 S.W.3d at 478. "[A] subsequent startling event or condition which is related to the prior event can produce an excited utterance." *Gordon*, 952 S.W.2d at 820 (concluding that the startling event was the victim's pain from urination related to the rape); *State v. Carpenter,* 773 S.W.2d 1, 9 (Tenn. Crim. App.1989) (holding that the startling event was the defendant's return to the scene); *see also State v. Burns*, 29 S.W.3d 40, 47 (Tenn. Crim. App. 1999) (concluding that hearing the defendant's name qualified as a startling event which caused the child to react but ultimately excluding the evidence because the victim's nonverbal reaction was too ambiguous to be connected with the defendant's act of child abuse). "[S]tatements made in response to questions may still be admissible if the declarant is under the excitement or stress of the event." *Gordon,* 952 S.W.2d at 820-21. The startling event should be such that it "'suspend[s] the normal, reflective thought processes of the declarant.'" *State v.*

-17-

*Franklin,* 308 S.W.3d 799, 823 (Tenn. 2010) (quoting *State v. Stout,* 46 S.W.3d 689, 699 (Tenn. 2001)).

Next, the statement must relate to the event. "A statement relates to the startling event when it describes all or part of the event or condition, or deals with the effect or impact of that event or condition." *Kendrick*, 454 S.W.3d at 478.

Finally, the statement must also be made under the stress or excitement from the event or condition.

> The "ultimate test" under this prong is whether the statement suggests "spontaneity" and whether the statement has a "logical relation" to the shocking event. When "an act or declaration springs out of the transaction while the parties are still laboring under the excitement and strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication," this prong may be satisfied.

*Kendrick*, 454 S.W.3d at 478 (Tenn. 2015) (quoting *Gordon,* 952 S.W.2d at 820).

In determining if the declarant is under the stress or excitement of the startling event, the court may consider the interval between the event and the statement, the nature and seriousness of the events, and the appearance, behavior, outlook, and circumstances of the declarant. *State v. Smith*, 868 S.W.2d 561, 574 (Tenn. 1993). The declarant's circumstances include age and physical or mental condition. *Kendrick*, 454 S.W.3d at 478. "[T]he 'length of time between a startling event and the statement does not automatically preclude the statement's being admissible as an excited utterance.'" *State v. Banks*, 271 S.W.3d 90, 116-17 (Tenn. 2008) (quoting *Williams v. State,* No. W2006-00605-CCA-R3-PC, 2007 WL 2120174, at *7 (Tenn. Crim. App. July 24, 2007)). The contents of the statement, which might indicate the degree of the declarant's stress, can also be considered. *Kendrick*, 454 S.W.3d at 478. The court may also consider whether the statement is made in response to an inquiry or whether it is self-serving. *Id.* at 479. The requirement that the statement be made under stress or excitement "relates most directly to the underlying rationale for the exception." *Gordon*, 952 S.W.2d at 820.

In *Smith*, the Court examined two statements allowed under the excited utterance exception and found that both were made under the stress of excitement. The first statement, regarding an assault by the defendant, was made when the declarant, who had been hysterical, had calmed down just enough to communicate. *Smith*, 868 S.W.2d at 573-74. The second statement was made after a separate assault, while the declarant appeared confused, in shock, and with a "flat" affect. *Id.* at 574. Considering the interval

-18-

between the assaults and statements, the nature of the assaults, and the descriptions of the declarant, the court concluded that the statements were properly admitted. *Id.* In *Gordon*, the victim experienced pain during urination after a sexual assault and began to cry. *Gordon*, 952 S.W.2d at 821. Two minutes later, after being reassured, she told her mother that the defendant had assaulted her. *Id.* The defendant argued that the victim was not under stress at the time of the statement, but the Tennessee Supreme Court concluded that the statements qualified under the exception because they were made shortly after the victim's "cry of anguish" and because the victim was still in "obvious discomfort." *Id.* On the other hand, in *State v. Tony A. Phipps*, No. E2008-01784-CCA-R3-PC, 2010 WL 39474960 (Tenn. Crim. App. Oct. 11, 2010), this court concluded that a statement was not an excited utterance when the declarant called 9-1-1 three days after the incident and the only testimony about his demeanor indicated that he was calm. *Id.* at *10.

The trial court found that the victim's statements to Ms. Hardy and Ms. Thomas were admissible under the excited utterance exception. In making the finding, the trial court noted that the startling event could be a subsequent event leading to stress or excitement. The trial court found that the startling event was the six-year-old's return to school and the questioning regarding his injuries. The trial court noted that Ms. Hardy testified the victim was "scared" and Ms. Thomas testified he was "solemn." The court concluded that the child was under the strain of the circumstances of being asked about his injuries, that he was "scared when confronted by a caregiver," and that he did not "have time to think" of a fabricated story.

We conclude the victim's statements should not have been admitted under the excited utterance exception to the rule against hearsay because there was no evidence to support the conclusion that he was under stress or excitement at the time. Ms. Hardy spoke with the victim for about ten minutes before he revealed the abuse, and he was "hesitant" to do so. Ms. Hardy stated, "[I]t took a few minutes before he finally told me." Ms. Hardy testified that the victim looked scared at first, but after making the statement, he appeared "relaxed and calm." He then repeated the statement to Ms. Thomas, who testified that he "wasn't upset … it was more like solemn." We conclude that the evidence does not support the conclusion that the victim was under stress or excitement at the time that he spoke to Ms. Hardy and Ms. Thomas. In particular, the statement lacks the "spontaneity" that underlies the rationale for the exception. *Kendrick*, 454 S.W.3d at 478. Neither witness testified that the victim appeared in any way agitated; their testimony was that he "wasn't upset" and that he was "calm" though "scared." He did not appear to be "laboring under the excitement and strain of the circumstances." *Id.* His disclosure was "hesitant," and it was made after he had spent the bulk of the morning being questioned about his injuries by school officials. The victim's conduct was more consistent with making a deliberate decision to disclose information to a trusted adult.

-19-

Unlike the declarants in *Smith* and *Gordon*, the victim was not, and had not recently been, upset, hysterical, crying, in shock, or in discomfort or pain. We conclude that the trial court erred in admitting the statements as substantive evidence under the excited utterance exception.

We note that the statements in question may still be admissible as prior inconsistent statements. The trial court admitted the victim's similar statements to Mr. Merkel and Ms. Mullins with a limiting instruction that they could only be considered for impeachment purposes. However, the jury was erroneously permitted to consider, over the Defendant's objection, the statements made to Ms. Hardy and Ms. Thomas as substantive evidence. *See State v. Kiser*, 284 S.W.3d 227, 266 (Tenn. 2009) (noting that, generally, "[p]rior inconsistent statements may be admissible only for the purpose of impeachment and not as substantive evidence"); *see also State v. Torayo Olandis Brown*, No. W2000-00472-CCA-R3-CD, 2002 WL 1482725, at *5 (Tenn. Crim. App. Feb. 4, 2002) (concluding that admission of hearsay statement as substantive evidence amounted to plain error because the failure to object could not have been tactical and the prosecution's evidence was otherwise weak); *compare State v. Smith*, 24 S.W.3d 274, 280 (Tenn. 2000) (concluding that the jury was properly allowed to consider prior inconsistent statements as substantive evidence when the defendant failed to object to their admission into evidence).

Errors in the admission of evidence are subject to harmless error analysis. *Burns*, 29 S.W.3d at 47-48; *Land*, 34 S.W.3d at 528-30; Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."). Here, the State presented various pieces of circumstantial evidence tending to support the conclusion that the victim's injuries were not accidental. The victim had no injuries prior to Thanksgiving but had redness on his cheek when he saw Nurse Bean on Monday. The Defendant and victim told her that they were coming from the park and that the victim fell from the swings, although they did not say when the fall had occurred. The victim did not have an injury to his chin or to the right side of his face, and the redness did not exhibit a handprint pattern. When the victim came to school on Wednesday, he had bruising on both sides of his face and an abrasion on his chin. He told school officials he had fallen from a swing, but witnesses testified that one fall could not have accounted for all his injuries. The victim also at one point stated he had fallen from a slide. One of the victim's bruises appeared to be in the pattern of a handprint. The Defendant accounted for all the injuries with the statement that the victim had fallen from the swings backward. The Defendant did not mention a fall from a bicycle or a fall onto a box spring until a later custody hearing. The victim testified at trial that he fell from a broken

swing set forward onto his face. The Defendant stated he was the only one responsible for disciplining the victim.

While there was evidence aside from the improperly admitted excited utterances to support the conviction, the only direct evidence at trial that the Defendant hit the victim came from the statements that were improperly admitted as excited utterances. Ms. Goetz's testimony that the victim stated that the Defendant had hit him was never put before the jury, and it cannot support a finding of harmless error. Accordingly, it appears that the error more probably than not affected the judgment, and we must reverse the convictions and remand for a new trial.

## CONCLUSION

The trial court improperly admitted the victim's hearsay statements under the excited utterance exception, and the convictions are accordingly reversed. The case is remanded for a new trial.

_____
JOHN EVERETT WILLIAMS, JUDGE